# EXHIBIT 7



**Navigators Pro**
*A Division of Navigators Management Company, Inc.*
*230 West Monroe Street, Suite 1575*
*Chicago, IL 60606*

January 14, 2014

Rachael Cook                                          Via Email: rcook@wsandco.com
Woodruff-Sawyer & Co.
2 Park Plaza, Suite 500
Irvine, CA 92614-2565

**Re:   Vizio Inc**
      **39 Tesla**
      **Irvine, CA 92618**
      **Policy Number: CH13DOL610110IV**
      **Expiring Policy Number: SF12DOL610110IV**

Dear Rachael:

Attached please find the above captioned policy.  Please review it carefully.

If you have any questions or concerns regarding this letter, please contact Keith Dau at  (312) 506-8179
or kdau@navg.com

Thank you for considering Navigators Insurance Company for your professional liability insurance
programs.

Sincerely,

Anita Strozier
Fax: (312) 506-8193
astrozier@navg.com



**Navigators Insurance Company**
One Penn Plaza
New York, NY 10119

**Policy Number: CH13DOL610110IV**

## DECLARATIONS
Attached to and forming part of
## SmartPolicy(sm)
This insurance is effected with Navigators Insurance Company

**THIS IS A CLAIMS-MADE POLICY WITH COSTS OF DEFENSE INCLUDED IN THE LIMIT OF LIABILITY.
PLEASE READ THE ENTIRE POLICY CAREFULLY.**

| ADMINISTRATOR NAME AND ADDRESS | PRODUCER NAME AND ADDRESS |
|---|---|
| Navigators Pro<br>A Division of Navigators Management Company, Inc.<br>One Penn Plaza, 32nd Floor<br>New York, NY 10119 | Woodruff-Sawyer & Co.<br>2 Park Plaza, Suite 500<br>Irvine, CA 92614-2565 |

**ITEM 1.**  **CORPORATION** - NAME AND PRINCIPAL ADDRESS:
Vizio Inc
39 Tesla
Irvine, CA 92618

**ITEM 2.**  **POLICY PERIOD:**
(a) Inception Date: December 31, 2013
(b) Expiration Date: June 30, 2015
at 12:01 a.m. both dates at the Principal Address in ITEM 1.

**ITEM 3.**  **DEFENSE OPTION:**
☐ Duty to Defend          ☑ No Duty to Defend

**ITEM 4.**  **COVERAGE PARTS ISSUED AS A PART OF THIS POLICY:**

☑ Directors and Officers Liability
   ☑ Optional Entity Coverage under Insuring Agreement C
   ☑ Optional Costs Coverage under Insuring Agreement D

☑ Employment Practices Liability
   ☑ Optional Third Party Coverage

☑ Fiduciary Liability
   ☐ Optional Settlement Program Coverage

**ITEM 5.**  **LIMITS OF LIABILITY:**

**a.**  $5,000,000  Maximum aggregate limit of liability for all **Loss**, including **Costs of Defense**, under DIRECTORS AND OFFICERS LIABILITY Coverage Part, if purchased
   **i.**  $250,000  Maximum aggregate limit of liability for all **Investigation Costs** under Optional Entity Coverage under DIRECTORS AND OFFICERS LIABILITY Coverage Part, if purchased
   **ii.**  $500,000  Additional Excess Aggregate Limit of Liability Dedicated for Directors and Officers

**b.**  $2,500,000  Maximum aggregate limit of liability for all **Loss**, including **Costs of Defense**, under EMPLOYMENT PRACTICES LIABILITY Coverage Part, if purchased

**c.**  $1,000,000  Maximum aggregate limit of liability for all **Loss**, including **Costs of Defense**, under FIDUCIARY LIABILITY Coverage Part, if purchased
   **i.**  N/A  Maximum aggregate limit of liability for all **Settlement Expenses** under Optional Settlement Program Coverage under FIDUCIARY LIABILITY Coverage Part, if purchased

**d.**  $5,500,000  Maximum aggregate limit of liability for all **Loss**, including **Costs of Defense**, under this Policy

**Navigators Insurance Company**                              Policy Number:  CH13DOL610110IV

### DECLARATIONS (Continued)
Attached to and forming part of **SmartPolicy**(sm)

| ITEM 6. | RETENTIONS: | | |
|---|---|---|---|
| | a. | Under DIRECTORS AND OFFICERS LIABILITY Coverage Part: | |
| | | (i) | $0 | Each **Claim** under Insuring Agreement A |
| | | (ii) | $100,000 | Each **Claim** under Insuring Agreement B |
| | | (iii) | $100,000 | Each **Claim** under Insuring Agreement C |
| | | (iv) | N/A | Each **Claim** under Insuring Agreement D |
| | b. | $100,000 | Each **Claim** under EMPLOYMENT PRACTICES LIABILITY Coverage Part |
| | c. | $0 | Each **Claim** under FIDUCIARY LIABILITY Coverage Part |

| ITEM 7. | PRIOR AND PENDING DATE: |
|---|---|
| | a. Under DIRECTORS AND OFFICERS LIABILITY Coverage Part, if purchased: December 13, 2003 |
| | b. Under EMPLOYMENT PRACTICES  LIABILITY Coverage Part, if purchased: December 13, 2003 |
| | c. Under FIDUCIARY LIABILITY Coverage Part, if purchased: December 13, 2003 |

| ITEM 8. | PREMIUM: | $56,437 | ITEM 9. | WAIVER OF RECOURSE PREMIUM: | $0 |
|---|---|---|---|---|---|

| ITEM 10. | FORMS AND ENDORSEMENTS ATTACHED AT ISSUANCE: | | | |
|---|---|---|---|---|
| | NAV-SPGT-001 (09/08) | NAV-SPDO-001 (09/08) | NAV-SPEP-001 (09/08) | NAV-SPFL-001 (09/08) | NAV-SIG-001 (10/01) |
| | NAV-ML-002 (11/12) | NAV-PDL-300-CA (11/09) | NAV-PDL-301-CA (11/09) | NAV-PDL-567 (01/09) | NAV-PDL-008 (11/12) |
| | NAV-PDL-013 (11/12) | NAV-PDL-579 (04/09) | NAV-PDL-006 (11/12) | NAV-PDL-001 (11/12) | NAV-PDL-003 (11/12) |
| | NAV-DOMA-080 (07/03) | NAV-DOMA-080 (07/03) | NAV-DOMA-080 (07/03) | NAV-PDL-678 (09/08) | NAV-PDL-663 (03/10) |
| | NAV-DOMA-080 (07/03) | | | | |

**These Declarations, the signed and completed Application and the Policy, with endorsements, will constitute the contract between the Insured and the Insurer.**

Issuing Office:  Chicago

Issue Date:  January 14, 2014

# Navigators Insurance Company

## GENERAL TERMS AND CONDITIONS

**THIS IS A CLAIMS-MADE POLICY
WITH COSTS OF DEFENSE INCLUDED IN THE LIMIT OF LIABILITY.
PLEASE READ THE ENTIRE POLICY CAREFULLY.**

In consideration of the payment of the premium and in reliance upon all statements made and information furnished to the insurance company shown in the Declarations (the "Insurer"), including the statements made in the **Proposal Form**, and subject to all terms, conditions and limitations of this Policy, the **Insureds** and the Insurer agree:

### Section I.  Defense Obligations

**A.**     If ITEM 3 of the Declarations states that the "Duty to Defend" option has been elected, the Insurer will have the right and duty to defend any **Claim** against any **Insured** covered under this Policy, even if the allegations in such **Claim** are groundless, false or fraudulent.  The Insurer will give consideration to the **Insureds'** preference for defense counsel, but the final decision regarding the appointment of defense counsel will rest with the Insurer.  The **Insureds** will have the right, at their own expense, to associate with the Insurer in the defense of any **Claim** and the negotiation of any settlement thereof.

**B.**     If ITEM 3 of the Declarations states that the "No Duty to Defend" option has been elected, the Insurer will have no duty to defend any **Claim** against any **Insured**, and it will be the duty of the **Insureds**, and not of the Insurer, to defend any **Claim**.  The Insurer will have the right, but not the duty, to associate with the **Insureds** in the investigation, defense or settlement of any **Claim** to which coverage under this Policy may apply.  The Insurer will advance **Costs of Defense** prior to the final disposition of any **Claim** covered by this Policy, on the condition that:

   1.     any applicable retention shall have been satisfied;

   2.     any amounts advanced by the Insurer will reduce the Insurer's applicable Limit of Liability under any applicable Coverage Part and under this Policy to the extent such amounts are not in fact repaid; and

   3.     in the event it is finally established that the Insurer has no liability under the Policy for **Loss** in connection with such **Claim**, the **Insureds** will repay the Insurer upon demand all **Costs of Defense** advanced to them or on their behalf.

**C.**     Whether the "Duty to Defend" or the "No Duty To Defend" option shall have been elected, **Costs of Defense** will be part of, and not in addition to, all applicable Limits of Liability set forth in ITEM 5 of the Declarations, and the Insurer's payment of **Costs of Defense** will reduce, and may exhaust, such Limit or Limits of Liability.

### Section II.  Definitions

**A.**     "**Claim**" will mean:

   1.     a written demand for monetary or non-monetary relief made against any **Insured**;

   2.     any written request for any **Insured** to toll or waive any potentially applicable statute of limitations; or

   3.     a civil, criminal, administrative or arbitration proceeding brought against any **Insured** seeking monetary or non-monetary relief and commenced by the service of a complaint or similar

pleading, the return of an indictment or criminal information, or the receipt or filing of notice of charges or similar document.

**B.** "**Company**" will mean the **Corporation** and any **Subsidiary**.

**C.** "**Corporation**" will mean the entity named in ITEM 1 of the Declarations.

**D.** "**Costs of Defense**" will mean reasonable and necessary legal fees, costs and expenses incurred in the investigation, defense or appeal of any **Claim**, including the costs of an appeal bond, attachment bond or similar bond; provided, however, that the Insurer will have no obligation to apply for or furnish any such bond.

**E.** "**Executive Officer**" shall mean any past, present or future President, Chief Executive Officer or Chief Financial Officer of the **Company**.

**F.** "**Financial Insolvency**" will mean any entity included within the term "**Company**" becoming a debtor in possession, or the appointment of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate such entity.

**G.** "**Foreign Jurisdiction**" means any jurisdiction, other than the United States or any of its territories or possessions.

**H.** "**Insured**" will have, with respect to the coverage afforded in each Coverage Part attached to and forming a part of this Policy, the meaning given to that term in such Coverage Part.

**I.** "**Insured Person**" will have, with respect to the coverage afforded in each Coverage Part attached to and forming a part of this Policy, the meaning given to that term in such Coverage Part.

**J.** "**Loss**" will mean compensatory damages, punitive or exemplary damages, the multiple portion of any multiplied damage award, settlements and **Costs of Defense**; provided, however, that **Loss** will not include salaries, wages, overhead or benefit expenses associated with any **Insured**, criminal or civil fines or penalties imposed by law, taxes, or any matter which may be deemed uninsurable under the law pursuant to which this Policy shall be construed.  It is understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive or exemplary damages or the multiple portion of any multiplied damage award.

**K.** "**Policy Period**" will mean the period from the inception date of this Policy to the expiration date of this Policy as set forth in ITEM 2 of the Declarations, or to its earlier termination if applicable.

**L.** "**Proposal Form**" will mean:

  1.     the application or proposal form attached to and forming part of this Policy, together with any materials submitted therewith; and

  2.     any applications or proposal forms submitted in connection with any policy in an uninterrupted series of policies issued by the Insurer of which this Policy is a renewal or replacement, together with any materials submitted therewith;

all of which will be retained on file by the Insurer and will be deemed to be physically attached to and form part of this Policy.

**M.** "**Related Wrongful Acts**" will mean **Wrongful Acts** which are logically or causally connected by reason of any common fact, circumstance, situation, transaction, event or decision.

**N.** "**Subsidiary**" will mean:

  1.     any entity during any time in which the **Corporation** owns, directly or indirectly, more than fifty percent (50%) of the outstanding securities or interests representing the present right to vote for

the election or appointment of such entity's directors, managers, or persons occupying an equivalent position; and

2.   any joint venture during any time in which the **Corporation** owns, directly or indirectly, fifty percent (50%) or more of the outstanding securities or interests representing the present right to vote for the election or appointment of such entity's directors, managers, or persons occupying an equivalent position if, pursuant to a written agreement with the owners of such joint venture's remaining securities or interests, the **Corporation** solely controls the management and operations of such joint venture.

**O.**   "**Wrongful Act**" will have, with respect to the coverage afforded in each Coverage Part attached to and forming a part of this Policy, the meaning given to that term in such Coverage Part.

### Section III.   Discovery – Coverage Extensions

**A.**   In the event the Insurer refuses to renew this Policy, the **Insureds** will have the right, upon payment of seventy five percent (75%) of the annual premium, (or if the **Policy Period** is other than annual, seventy five percent (75%) of the annualized premium), to an extension of the coverage provided by this Policy with respect to any **Claim** first made against any **Insured** during the period of twelve (12) months after the end of the **Policy Period** (the "Discovery Period"), but only with respect to **Wrongful Acts** committed or attempted, or allegedly committed or attempted, before the end of the **Policy Period**.  As a condition precedent to the right to purchase the Discovery Period, the total premium for this Policy must have been paid, and a written request together with payment of the appropriate premium for the Discovery Period must be provided to the Insurer no later than thirty (30) days after the end of the **Policy Period**.  The purchase of the Discovery Period will not in any way increase any Limit of Liability, or create a separate or additional Limit of Liability, applicable to any Coverage Part or to this Policy as a whole, and the limits of liability with respect to **Claims** made during the Discovery Period will be part of, and not in addition to, the applicable Limit or Limits of liability as set forth in ITEM 5 of the Declarations.

**B.**   In the event of the death, incapacity or bankruptcy of any **Insured Person**, a **Claim** against such **Insured Person's** estate, heirs, legal representatives or assigns for a **Wrongful Act** committed or attempted, or allegedly committed or attempted, by such **Insured Person** will be deemed to be a **Claim** against such **Insured Person**.

**C.**   Subject to all other terms, conditions and limitations of and endorsements to this Policy, the coverage provided under this Policy to **Insured Persons** will be extended also to apply to the lawful spouses or domestic partners of the **Insured Persons**; provided, that the extension of coverage afforded under this Section III.C will apply only to the extent any such spouse or domestic partner is a party to a **Claim** solely in his or her capacity as a spouse or domestic partner of an **Insured Person** and such **Claim** seeks damages recoverable from marital community property, property jointly held by an **Insured Person** and his or her spouse or domestic partner, or property transferred from an **Insured Person** to his or her spouse or domestic partner.  No extension of coverage will be available under this Section III.C for any **Loss** for which any spouse or domestic partner of an **Insured Person** may be liable by reason of his or her own actual or alleged acts, errors, omissions, misstatements, misleading statements or breaches of duty.

### Section IV.   Limit of Liability

**A.**   With respect to each Coverage Part, the Insurer will be liable to pay one hundred percent (100%) of **Loss**, including **Costs of Defense**, in excess of the applicable retention amount set forth in ITEM 6 of the Declarations, up to the Limit of Liability applicable to such Coverage Part as set forth in ITEM 5 of the Declarations.

**B.**   The Insurer's maximum aggregate Limit of Liability under this Policy for all **Loss**, including **Costs of Defense**, will be the amount set forth in ITEM 5.d of the Declarations, regardless of the number of **Insureds**, the number of **Claims**, the number of Coverage Parts, the time of payment or the Coverage Part or Coverage Parts under which such **Loss** is paid.

**C.**    If the Insurer's maximum aggregate Limit of Liability with respect to any **Claim** is or has been exhausted by the payment of **Loss**, all obligations of the Insurer in connection with such **Claim** will be completely fulfilled and exhausted, and the Insurer will have no obligation to make any further payments of **Loss** or to advance any **Costs of Defense** in connection with such **Claim** or to defend or continue to defend such **Claim**.  If the Insurer's maximum aggregate Limit of Liability under this Policy is exhausted by the payment of **Loss**, all obligations of the Insurer under this Policy will be completely fulfilled and exhausted, and the Insurer will thereafter have no obligation to make any further payments of **Loss**, to advance any **Costs of Defense** or to defend or continue to defend any **Claim**; under such circumstances, the entire premium for this Policy will be deemed to have been fully earned.

## Section V.  Retention

**A.**    One retention shall apply to each and every **Claim**.  If a **Claim** gives rise to coverage under more than one Coverage Part, the retention applicable to **Loss** under each such Coverage Part will be applied separately to that **Loss** payable under such Coverage Part; provided, however, that the sum of all such retentions will not exceed the largest single retention applicable to such **Claim** under any applicable Coverage Part.  The retention amount will be borne by the **Insureds** uninsured at their own risk.

**B.**    No retention will apply to **Loss** incurred by any **Insured Person** for which the **Company** is neither required nor permitted to provide advancement or indemnification, or for which the **Company** is required or permitted to provide advancement or indemnification but is unable to do so solely by reason of its **Financial Insolvency**.

## Section VI.  Allocation, Costs of Defense and Settlements

**A.**    If a **Claim** made against any **Insured** includes both covered and uncovered matters, or is made against any **Insured** and others, the **Insureds** and the Insurer recognize that there must be an allocation between **Loss** and uninsured damages, settlement amounts and other liabilities in connection with such **Claim**.  The **Insureds** and the Insurer will use their best efforts to agree upon a fair and proper allocation. If no agreement can be reached, the Insurer will advance **Costs of Defense** based on what it believes is a fair and proper allocation until such time as the issue can be resolved.

**B.**    The **Insureds** may not incur **Costs of Defense**, or admit liability, offer to settle, or agree to any settlement in connection with any **Claim** without the express prior written consent of the Insurer, which consent shall not be unreasonably withheld.  The Insurer will not be liable for any admission, assumption or stipulation of liability, settlement or **Costs of Defense** to which it has not consented.

## Section VII.  Notice

**A.**    As a condition precedent to their rights under this Policy in connection with any **Claim**, the **Insureds** must give the Insurer written notice of such **Claim** as soon as practicable after such **Claim** is made, but in no event later than sixty (60) days after the end of the **Policy Period**.  Subject to the foregoing, written notice of a **Claim** will be deemed to have been given as soon as practicable if such notice is given not later than sixty (60) days after the Chairman of the Board of Directors, President, Chief Executive Officer, Chief Financial Officer, General Counsel, or Risk Manager of the **Company** first becomes aware of such **Claim**.

**B.**    If, during the **Policy Period** or Discovery Period, any **Insured** first becomes aware of any circumstances which may reasonably be expected to give rise to a Claim being made against an **Insured** and shall give written notice to the Insurer of:

   1.    the circumstances;

   2.    the **Wrongful Act** allegations anticipated; and

   3.    the reasons for anticipating such a **Claim**;

with full particulars as to the dates, persons and entities involved, then a **Claim** which is subsequently made against such Insured and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any **Wrongful Act** which is the same as or related to any **Wrongful**

**Act** alleged or contained in such circumstances, shall be considered made at the time the Insurer received such written notice.

**C.**      Notice to the Insurer under Sections VII.A and B above must be given to:

> Navigators Insurance Company
> One Penn Plaza
> New York, NY 10119
> ATTN: Navigators Pro Claims Department

## Section VIII.  General Conditions

**A.      Worldwide Coverage**

The coverage provided by this Policy will apply to **Claims** made, and to **Wrongful Acts** committed or attempted or allegedly committed or attempted, anywhere in the world.

**B.      Interrelationship of Claims**

All **Claims** involving the same **Wrongful Act** or **Related Wrongful Acts** of one or more **Insureds** will be considered a single **Claim**, and will be deemed to have been made on the earlier of the following dates: (1) the earliest date on which any such **Claim** was first made; or (2) the earliest date on which any such **Wrongful Act** or **Related Wrongful Act** was reported under this Policy or any other policy providing similar coverage.

**C.      Advancement and Indemnification**

The certificate of incorporation, charter or other organizational documents of each entity included within the term "**Company**," including by-laws and resolutions, will be deemed to require advancement and indemnification of **Loss** to the **Insured Persons** to the fullest extent permitted by law.

**D.      Other Insurance**

All **Loss** payable under this Policy will be specifically excess of, and will not contribute with, any other valid and collectible insurance, including but not limited to any other insurance under which there is a duty to defend, unless such other insurance is specifically excess of this Policy.  This Policy will not be subject to the terms of any other insurance policy or program.

**E.      Cancellation or Non-Renewal**

1.      This Policy may be cancelled by the **Corporation** at any time by written notice to the Insurer. Upon cancellation, the Insurer shall retain the customary short rate portion of the premium.  Return or tender of any unearned premium will not be a condition of cancellation.  This Policy may be cancelled by the Insurer only for non-payment of premium;

2.      The Insurer will not be required to renew this Policy.  If the Insurer elects not to renew this Policy, the Insurer will provide the **Corporation** with no less than sixty (60) days advance notice thereof.  An offer by the Insurer to renew on different terms will not constitute non-renewal.

**F.      Representations and Severability**

It is agreed by the **Insured**s that the particulars and statements contained in the **Proposal Form** and any information provided therewith (which shall be on file with the Insurer and be deemed attached hereto as if physically attached hereto) are the basis of this Policy and are to be considered as incorporated in and constituting a part of this Policy.  It is further agreed by the **Insureds** that the statements in the **Proposal Forms** or in any information provided therewith are their representations, that they are material and that this Policy is issued in reliance upon the truth of such representations; provided, in the event that the **Proposal Form** contains misrepresentations made with the actual intent to deceive, or contains misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by

Underwriters under this Policy, this Policy shall be void and have no effect whatsoever with respect to those **Insureds** who made or had knowledge of such misrepresentations.  Knowledge of any matter which may give rise to a claim or any misrepresentation made by an **Executive Officer** shall be imputed to the **Company**, but will not be imputed to any **Insured Person** who had no knowledge of the matter which may give rise to a claim or the misrepresentation.

**G.      Changes in Exposure**

1.      If, during the **Policy Period**, the **Company** acquires the assets of another entity or acquires a **Subsidiary** or any other entity, by merger, consolidation or otherwise, the coverage afforded under this Policy will be available for **Loss** resulting from **Claims** made during the **Policy Period** or, if purchased, the Discovery Period, against any such entity or any **Insured Persons** thereof for **Wrongful Acts** committed or attempted, or allegedly committed or attempted, by them after the effective date and time of such acquisition.  If, however, such assets or the assets of the entity so acquired exceed twenty-five percent (25%) of the total assets of the **Company** as of the date of the most recently audited financial statements of the **Company** or the number of employees of the entity so acquired exceeds twenty-five percent (25%) of the number of the **Company's** employees as of the date of the most recently audited financial statements of the **Company**, such coverage will be available only for ninety (90) days after the effective date and time of such acquisition or until the end of the **Policy Period**, whichever is earlier, unless written notice of such acquisition is given to the Insurer, together with such additional information as the Insurer may request, and the Insurer agrees by written endorsement to this Policy to provide such additional coverage on such terms, conditions and limitations, and for such additional premium, as the Insurer may require.  If, however, this Policy contains a Fiduciary Liability Coverage Part, this Section VIII.G.1 will not apply to or operate to extend coverage under such Coverage Part unless the Insurer so agrees by written endorsement to such Coverage Part;

2.      If, during the **Policy Period**, any entity ceases to be a **Subsidiary**, the coverage afforded under this Policy in respect of such entity and any **Insureds** thereof by reason of their service with or relationship to such entity will continue to apply to **Claims** made during the **Policy Period** or, if purchased, the Discovery Period, against them for **Wrongful Acts** committed or attempted, or allegedly committed or attempted, by them before such entity ceases to be a **Subsidiary**, but such coverage will cease with respect to **Claims** against any such entity or any such **Insureds** for **Wrongful Acts** committed or attempted, or allegedly committed or attempted, by them after such entity ceases to be a **Subsidiary**;

3.      If, during the **Policy Period**, a transaction occurs wherein another person, entity, or group of affiliated persons and/or entities gains control of the **Corporation** through the ownership of more than fifty percent (50%) of the voting stock of the **Corporation**, or the **Corporation** merges into another entity or consolidates with another entity such that the **Corporation** is not the surviving entity, the coverage afforded under this Policy will continue to apply to **Claims** made during the **Policy Period** or, if purchased, the Discovery Period, against any **Insured** for **Wrongful Acts** committed or attempted, or allegedly committed or attempted, before the effective date of such transaction, but coverage will cease with respect to **Claims** against the **Insureds** for **Wrongful Acts** committed or attempted, or allegedly committed or attempted, thereafter.  Under such circumstances, the **Insureds** may no longer cancel the Policy and the entire premium for this Policy will be deemed to have been fully earned as of the effective date of such transaction.

**H.      Quotes for Securities Offerings**

If, during the **Policy Period**, any public offering of the **Company's** securities occurs that is not exempt from registration under the Securities Act of 1933 and, at least thirty (30) days prior to the effective date of such offering, the **Insureds** give the Insurer written notice thereof together with all information related thereto as the Insurer may request, the Insurer agrees to give the **Insureds** a quote for coverage with respect to such offering; provided, that such quote will be on such terms and conditions, and for such additional premium, as the Insurer in its sole and absolute discretion shall deem appropriate, and any coverage provided will be on such forms as are in use by the Insurer for public companies at the time of such offering.  In the event of an Initial Public Offering of the **Company's** securities, if the **Insureds**

choose to cancel this Policy and purchase a replacement Policy from the Insurer, this Policy will be cancelled and premium returned on a pro-rata basis.

**I.      Assistance, Cooperation and Subrogation**

1.      The **Insureds** agree to provide the Insurer with all information, assistance and cooperation that the Insurer may reasonably request, and to do nothing which would in any way increase the Insurer's exposure under this Policy or prejudice the Insurer's actual or potential rights of recovery;

2.      In the event of a **Claim**, the **Insureds** shall, as soon as practicable, furnish the Insurer with copies of reports, investigations, pleadings and other papers in connection therewith;

3.      In the event of any payment under this Policy, the Insurer will be subrogated to all of the **Insureds'** rights of recovery and the **Insureds** will execute all papers required and do everything that may be necessary to secure such rights, including the execution of such documents as may be necessary to enable the Insurer to effectively bring suit in the name of any **Insured**.

**J.      Assignment**

Assignment of interest under this Policy will not bind the Insurer until its consent is endorsed hereon.

**K.      Conformity to Statute**

Any terms of this Policy which are in conflict with the terms of any applicable laws are hereby amended to conform to such laws.

**L.      No Action Against the Insurer**

1.      No action shall be taken against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy, and until the **Insureds'** obligation to pay shall have been finally determined by an adjudication against the **Insureds** or by written agreement of the **Insureds**, the claimant or claimants and the Insurer;

2.      No person or organization shall have any right under this Policy to join the Insurer as a party to any **Claim** against the **Insureds**; nor may the Insurer be impleaded by any **Insured** or such **Insured's** legal representative in any such **Claim**.

**M.      Corporation Represents Insureds**

By acceptance of this Policy, the **Corporation** is designated to act on behalf of the **Insureds** for all purposes under this Policy, including but not limited to the giving and receiving of all notices and correspondence, the cancellation or non-renewal of this Policy, the payment of premiums, and the receipt of any return premiums that may be due under this Policy.

**N.      Bankruptcy or Insolvency**

No bankruptcy or insolvency of any **Insured** will relieve the Insurer of any of its obligations under this Policy.

**O.      Application of Coverage Parts**

All Coverage Parts are subject to these GENERAL TERMS AND CONDITIONS.  Except as stated in these GENERAL TERMS AND CONDITIONS or unless specifically stated otherwise in any Coverage Part or endorsement, the provisions of each Coverage Part will apply only to that Coverage Part and will in no way limit, increase or affect the coverage afforded under any other Coverage Part.  If any provision in these GENERAL TERMS AND CONDITIONS is inconsistent or in conflict with the terms and conditions of any Coverage Part, the terms and conditions of that Coverage Part will control for the purposes thereof.

**P.** **OFAC Disclosure**

The Office of Foreign Assets Control ("OFAC") administers and enforces U.S. sanctions policy, based on Presidential declarations of "national emergency." OFAC has identified and listed numerous foreign agents, front organizations, terrorists, terrorist organizations and narcotics traffickers as "Specially Designated Nationals and Blocked Persons"; this list can be located on the website for the United States Department of the Treasury (www.treas.gov/ofac). In accordance with OFAC regulations, if it is determined that any **Insured**, or any person or entity claiming the benefits of this insurance, has violated U.S. sanctions law or is a Specially Designated Nationals and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance will be immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments or premium refunds may be made without authorization from OFAC. Other limitations on premiums and payment may also apply.

**Q.** **Headings**

The headings of the various sections of this Policy are intended for reference only and are not to form part of the terms and conditions of coverage.

**R.** **Entire Agreement**

By acceptance of this Policy, the **Insureds** agree that this Policy (including the Declarations, the **Proposal Form** and the Coverage Parts specified in ITEM 4 of the Declarations), and any written endorsements attached hereto constitute the entire agreement between the parties relating to this insurance. The terms, conditions and limitations of this Policy can be waived or changed only by written endorsement.

# DIRECTORS AND OFFICERS LIABILITY COVERAGE PART

### THIS IS A CLAIMS-MADE POLICY
### WITH COSTS OF DEFENSE INCLUDED IN THE LIMIT OF LIABILITY.
### PLEASE READ THE ENTIRE POLICY CAREFULLY.

In consideration of the payment of the premium and in reliance upon all statements made and information furnished to the insurance company shown in the Declarations (the "Insurer"), including the statements made in the **Proposal Form**, and subject to all terms, conditions and limitations of this Policy, the **Insureds** and the Insurer agree:

**Section I.  Insuring Agreements**

**A.**      The Insurer will pay to or on behalf of the **Insured Persons** all **Loss** which the **Insured Persons** are legally obligated to pay as a result of a **Claim** first made against the **Insured Persons** during the **Policy Period** or the Discovery Period, if purchased, for a **Wrongful Act** by the **Insured Persons**, except for **Loss** which the **Company** actually pays as advancement or indemnification.

**B.**      The Insurer will pay to or on behalf of the **Company** all **Loss** which the **Insured Persons** are legally obligated to pay as a result of a **Claim** first made against the **Insured Persons** during the **Policy Period** or the Discovery Period, if purchased, for a **Wrongful Act** by the **Insured Persons**, but only to the extent the **Company** is required or permitted by law to pay such **Loss** to or on behalf of the **Insured Persons** as advancement or indemnification.

**C.**      If it is stated in ITEM 4 of the Declarations that the Optional Entity Coverage under INSURING AGREEMENT C of this Coverage Part has been purchased, the Insurer will pay to or on behalf of the **Company** all **Loss** which the **Company** is legally obligated to pay as a result of a **Claim** first made against it during the **Policy Period** or the Discovery Period, if purchased, for a **Wrongful Act** by the **Company**.

**D.**      If it is stated in ITEM 4 of the Declarations that the Optional Investigation Costs Coverage under INSURING AGREEMENT D of this Coverage Part has been purchased, the Insurer will pay to, or on behalf of the **Company, Investigation Costs** which the **Company** is legally obligated to pay as a result of a **Derivative Demand** first received by the **Company** during the **Policy Period** or the Discovery Period, if purchased.

**Section II.  Definitions**

**A.**      For purposes of this Coverage Part, the term "**Claim**" will include an administrative or regulatory investigation of an **Insured Person** which is commenced by the filing or issuance of a notice of charges, formal investigative order or similar document specifically identifying in writing such **Insured Person** as a person against whom a **Claim**, as defined in Section II.A of the GENERAL TERMS AND CONDITIONS, may be brought. **"Claim"** will also include an extradition order or similar document.

**B.**      "**Derivative Demand**" will mean any written demand by or on behalf of any holder of securities issued by the **Company**, in his or her capacity as such, made upon the board of directors or managers of the **Company** to bring a civil proceeding against one or more of the **Insured Persons** for a **Wrongful Act**, but only if such demand is made totally independently of, and without the solicitation, assistance, active participation or intervention of, the **Company** or any **Insured Person**.

**C.**      "**Employee**" will mean:

1.      any individual whom the **Company** compensates by wages, salary and/or commissions and whose labor or service is directed by the **Company**, whether such individual performs such labor or service on a full-time, part-time, seasonal or temporary basis;

2.      any individual who performs labor or services for the **Company** as a volunteer; and

3.      any individual who is leased or loaned to the **Company** to perform labor or service for the **Company**, but only if the **Company** provides indemnification to such individual in the same manner and to the same extent as to its other **Employees**.

**D.**      For purposes of this Coverage Part, the term "**Insured**" will mean the **Company** and all **Insured Persons**.

**E.**      For purposes of this Coverage Part, the term "**Insured Person**" will mean:

1.      any past, present or future duly elected or appointed director, officer or member of the board of managers or management committee of the **Company**;

2.      any in-house general counsel of the **Company**;

3.      any executive of the **Company** located outside of the United States of America who holds a position with respect to the **Company** equivalent to any position described in Sections II.C.1 or II.C.2 above; or

4.      any **Employee**.

**F.**      "**Investigation Costs**" will mean reasonable and necessary expenses incurred by the **Company** or any committee of the **Company's** board of directors or managers in the investigation and evaluation of a **Derivative Demand**; provided, however, that **Investigation Costs** will not include salaries, wages, overhead or benefit expenses associated with any **Insured**.

**G.**      For purposes of this Coverage Part, the term "**Loss**" will include pre- and post-judgment interest and, if it is stated in ITEM 4 that Optional Investigation Costs Coverage has been purchased, **Investigation Costs**. "**Loss**" shall not include any portion of damages, judgments or settlements arising out of any **Claim** alleging that the **Company** paid an inadequate price or consideration for the purchase of the **Company's** securities.

With respect to any **Claim** arising out of any Public or Private Offering of Securities of the **Company**, the Insurer shall not assert that the portion of any settlement and/or **Costs of Defense** of that **Claim** which relates to any alleged violations of Section 11 or 12 of the Securities Act of 1933, as amended, constitutes uninsurable loss and shall treat that portion of such settlement and/or **Cost of Defense** as constituting **Loss** under the Policy.

**H.**      "**Outside Capacity**" will mean service by an **Insured Person** as a director, officer, trustee, regent, governor or equivalent executive of an **Outside Entity**, but only if such service is with the knowledge and consent of, or at the request of, the **Company**.

**I.**      "**Outside Entity**" will mean any corporation or organization other than the **Company** which is exempt from taxation under Sections 501(c)(3) - (10), 501(c)(19), 501(d) or 509(a)(1) – (3) of the Internal Revenue Code of 1986, as amended, or any rule or regulation promulgated thereunder.

**J.**      For purposes of this Coverage Part, the term "**Wrongful Act**" will mean:

1.      any actual or alleged act, omission, error, misstatement, misleading statement, neglect or breach of duty by any **Insured Person** in his or her capacity as such with the **Company**;

2.      any matter claimed against any **Insured Person** solely by reason of his or her status with the **Company**;

3.      any actual or alleged act, omission, error, misstatement, misleading statement, neglect or breach of duty by any **Insured Person** in his or her **Outside Capacity**; or

4.      with respect only to coverage under INSURING AGREEMENT C, if purchased, any actual or alleged act, omission, error, misstatement, misleading statement, neglect or breach of duty by the **Company**.

## Section III.  Exclusions

**A.**      The Insurer will not be liable under this Coverage Part to make any payment of **Loss**, including **Costs of Defense**, in connection with any **Claim** made against any **Insured**:

1.      brought about or contributed to by:

a.      the gaining by any **Insured** of any profit, advantage or remuneration to which such **Insured** was not legally entitled; or

b.      the deliberately fraudulent or criminal acts of any **Insured**;

provided, however: (i) this exclusion shall only apply if it is finally adjudicated such conduct in fact occurred; (ii) this exclusion shall not apply to coverage provided under Insuring Agreement B; and (iii) sub-paragraph (a) of this exclusion above shall not apply to any **Claim** arising out of an initial public offering, secondary public offering, a follow-on public offering, or private placement offering of securities of the **Company**;

2.      based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any **Wrongful Act** or **Related Wrongful Act** or any fact, circumstance or situation which has been the subject of any notice given under any other policy of which this Coverage Part is a renewal or replacement;

3.      based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any prior and/or pending civil, criminal, administrative or investigative proceeding involving the **Company,** any **Insured** as of the Prior and Pending Date stated in ITEM 7 of the Declarations, or any fact, circumstance or situation underlying or alleged in such proceeding;

4.      for any actual or alleged:

a.      bodily injury, sickness, disease or death of any person, mental anguish, emotional distress, invasion of privacy, trespass, nuisance, wrongful entry or eviction, assault, battery, loss of consortium, false arrest, false imprisonment, malicious prosecution, abuse of process, libel, defamation or slander; or

b.      damage to or destruction of any tangible property, including the loss of use thereof;

5.      for any actual or alleged violation of the Employee Retirement Income Security Act of 1974, as amended, or any rules or regulations promulgated thereunder;

6.      for any actual or alleged act, omission, error, misstatement, misleading statement, neglect or breach of duty by any **Insured Person** in his or her capacity as an **Employee**, director, officer, trustee, regent, governor or equivalent executive of any entity other than the **Company** or an **Outside Entity**, even if directed or requested by the **Company** to serve in such capacity;

7.      for any **Wrongful Act** of any **Insured Person** in his or her **Outside Capacity** with respect to any **Outside Entity**, if such **Claim** is brought by or on behalf of the **Outside Entity** or any **Employee**, director, officer, trustee, regent, governor or equivalent executive thereof;

8.      by or on behalf of any **Insured** or any security holder of the **Company**; provided, however, that this exclusion shall not apply to any **Claim**:

a.      brought by any **Insured** where such **Claim** is in the form of a cross-claim or third party claim for contribution or indemnity which is part of and results directly from a **Claim** which is not otherwise excluded by the terms of this Coverage Part; or

b.      brought by any security holder of the **Company**, whether directly or derivatively, if the security holder bringing such **Claim** is acting totally independently of, and without the solicitation, assistance, active participation or intervention of, the **Company** or any **Insured Person**;

c.      brought in any bankruptcy proceeding by or against any entity included within the term "**Company**" by any creditors committee, examiner, trustee, receiver, liquidator or rehabilitator appointed with respect to such entity;

d.      brought by any **Insured Person** who has neither served in such capacity nor as consultant to any entity included within the term "**Company**" for at least three (3) years prior to such **Claim** having been first made;

e.      brought by any **Insured Person** of any entity included within the term "**Company**" formed and operating outside the United States of America or any of its territories or possessions against such **Company** or any **Insured Person** thereof, if such **Claim** is brought and maintained outside the United States of America, Canada or any other common law jurisdiction; or

f.      arises out of, is based upon, or is attributable to any whistleblower activity, including but not limited to any such activity protected under the Sarbanes-Oxley Act of 2002, the False Claims Act, or any similar federal, state, local or foreign law or statute;

9.      based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving actual or alleged seepage, pollution, radiation, emission or contamination of any kind; provided, however, that this exclusion shall not apply to any **Claim** alleging any violation of the securities laws of the United States of America, brought by a security holder of the **Company** if the security holder bringing such **Claim** is acting totally independently of, and without the solicitation, assistance, active participation or intervention of, the **Company** or any **Insured Person**;

10.     based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any initial public offering of the **Company's** securities or any registration statement or prospectus related thereto; provided, however, that if such initial public offering is not completed or consummated, this exclusion will not apply to **Wrongful Acts** in connection with the **Company's** preparation for such initial public offering, including any related road show, or its failure to go public.

11.     based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving the performance by any **Insured** of professional services for others for a fee or other compensation or remuneration; provided, however, that this exclusion will not apply to any **Claim** brought by a security holder of the **Company,** alleging any violation of the securities laws of the United States of America, if the security holder bringing such **Claim** is acting totally independently of, and without the solicitation, assistance, active participation or intervention of, the **Company** or any **Insured Person,** or brought by a security holder of the **Company** alleging that the **Insured Persons** failed to supervise or manage or were negligent in supervising or managing the **Insureds'** performance of professional services for others for a fee or other compensation or remuneration;

12.     for any **Wrongful Act** of any **Subsidiary** or the **Insured Persons** of such **Subsidiary** or any entity that merges with the **Company** or the **Insured Persons** of such entity that merges with the **Company** occurring:

a.      prior to the date such entity became a **Subsidiary** or was merged with the **Company**;

b.       subsequent to the date such entity became a **Subsidiary** or was merged with the **Company** which, together with a **Wrongful Act** occurring prior to the date such entity became a **Subsidiary** or was merged with the **Company**, would constitute **Related Wrongful Acts**; or

c.       subsequent to the date the **Corporation** ceased to own, directly or indirectly, more than fifty percent (50%) of the voting stock of such **Subsidiary**.

**B.**    The Insurer will not be liable under the Optional Entity Coverage under INSURING AGREEMENT C, if purchased, to make any payment of **Loss**, including **Costs of Defense**, in connection with any **Claim** made against the **Company**:

1.       based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any liability under any contract or agreement; provided, however, that this exclusion will not apply to the extent the **Company** would have been liable in the absence of such contract or agreement;

2.       based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any actual or alleged:

a.       wrongful dismissal, discharge or termination;

b.       sexual or other workplace harassment, including quid pro quo and hostile work environment;

c.       unlawful employment discrimination;

d.       employment-related invasion of privacy, defamation (including libel and slander) or negligent or intentional infliction of emotional distress;

e.       failure of the **Company** to create, provide for or enforce adequate or consistent employment-related policies;

f.       retaliatory treatment on account of an **Employee's** exercise or attempted exercise of his or her employment-related rights under law, including but not limited to Sections 806 and 1107 of the Sarbanes - Oxley Act of 2002;

g.       violation of employment-related civil rights relating to any of the above; or

h.       violation of the Family and Medical Leave Act of 1993;

3.       based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any actual or alleged infringement or misappropriation of copyright, patent, trademark, trade name, trade dress, service mark, trade secrets or other intellectual property, however this exclusion will not apply to a **Claim** alleging any violation of the securities laws of the United States, brought by a security holder of the **Company** if the security holder bringing such **Claim** is acting totally independently of, and without the solicitation, assistance, active participation or intervention of, the **Company** or any **Insured Person;**

4.       based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any actual or alleged price fixing, restraint of trade, monopolization, unfair trade practices or violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, or any other statute or law regulating anti-trust, monopoly, price fixing, price discrimination, predatory pricing or activities in restraint of trade.

C.      For the purpose of determining the applicability of the foregoing exclusions, no **Wrongful Act** of any **Insured Person** shall be imputed to any other **Insured Person**, and only the **Wrongful Acts** of any president, chief executive officer or chief financial officer of the **Company** shall be imputed to the **Company**.

**Section IV.  Claims Against Insured Persons for Wrongful Acts in Their Outside Capacity**

A.      In the event a **Claim** is made against an **Insured Person** for **Wrongful Acts** in his or her **Outside Capacity** with respect to any **Outside Entity**, the coverage afforded under this Coverage Part in respect of such **Claim** will be specifically excess of, and will not contribute with, any insurance available to such **Insured Person** from such **Outside Entity** and any advancement or indemnification such **Outside Entity** is required or permitted to make to such **Insured Person**.  If the Insurer shall have issued any policy or policies of insurance to such **Outside Entity**, payment by the Insurer under any such policy in respect of such **Claim** will reduce and may therefore exhaust, by the amount of such payment, the Insurer's Limit of Liability available under this Coverage Part for such **Claim**.

B.      For purposes of this Section IV, the certificate of incorporation, charter or other organizational documents of each **Outside Entity**, including by-laws and resolutions, will be deemed to require advancement and indemnification of **Loss** to such **Outside Entity's** directors, officers, trustees, regents, governors and equivalent executives to the fullest extent permitted by law.

**Section V.  Additional Excess Aggregate Limit of Liability**

A.      Notwithstanding anything in this Policy or this Coverage Part to the contrary, the Additional Excess Aggregate Limit of Liability Dedicated for Directors and Officers will be an additional Excess Limit of Liability in an aggregate amount not to exceed the amount stated in Item 5.a.ii of the Declarations, which amount is in addition to and not part of the Limits of Liability stated in Item 5.a. of the Declarations.

In the event the Additional Excess Aggregate Limit of Liability Dedicated for Directors and Officers is exhausted by payment of **Loss**, or has been tendered to or on behalf of Directors and Officers, then any and all obligations of the Insurer hereunder shall be deemed to be completely fulfilled and extinguished.

B.      No coverage shall be provided by Section V of this Coverage Part for the first **Claim** made for which coverage is provided under this Coverage Part.  This Additional Excess Aggregate Limit of Liability Dedicated for Directors and Officers is available solely for **Loss** resulting from any subsequent **Claim** that is covered under Insuring Agreement A of this Coverage Part.  The first **Claim** made for which coverage is provided under this Coverage Part shall be determined by the chronological time such **Claim** was made regardless of when coverage is acknowledged by the Insurer.

C.      The Additional Excess Aggregate Limit of Liability Dedicated for Directors and Officers shall be excess of any insurance available to pay **Loss** for such **Claims**, including this Policy and all insurance that is specifically excess to this Policy.  Such excess insurance must be completely exhausted by payment of loss, damages or costs of defense, as those terms are defined by such excess insurance, before the Insurer shall have any obligation to make any payment on account of the Additional Excess Aggregate Limit of Liability Dedicated for Directors and Officers.

D.For purposes of this provision only, Directors and Officers shall only mean:

1.      any past, present or future duly elected or appointed director, officer or member of the board of managers or management committee of the **Company**;

2.      any in-house general counsel of the **Company**; or

any executive of the **Company** located outside of the United States of America who holds a position with respect to the **Company** equivalent to any position described in Sections V.D.1 or V.D.2 above.

**Section VI.  Waiver of Retention under Certain Circumstances**

**A.**     No retention will apply under this Coverage Part to **Loss**, including **Costs of Defense**, incurred by the **Insured Persons** if advancement or indemnification of such **Loss** by the **Company** is neither required nor permitted under applicable law or, if advancement or indemnification of such **Loss** by the **Company** is required or permitted under applicable law, such advancement or indemnification is not made solely by reason of the **Company's Financial Insolvency**.

**B.**     If, in connection with any **Claim**, a final adjudication, with prejudice, pursuant to a trial, motion to dismiss or motion for summary judgment or a complete and final settlement, with prejudice, establishes that no **Insured** is liable for any **Loss** in connection with such **Claim**, no retention will apply to **Costs of Defense** incurred in connection with such **Claim** and, subject to all other terms, conditions and limitations of this Policy applicable to this Coverage Part, the Insurer will reimburse the **Insureds** for any covered **Costs of Defense** paid by them in connection with such **Claim**.


**Section VII.  Sub-Limit of Liability and Retention Applicable to Investigation Costs**

**A.**     The Insurer's maximum aggregate Limit of Liability for **Investigation Costs** will be the amount set forth in ITEM 5.a.i of the Declarations, which amount will be part of, and not in addition to, the Insurer's maximum aggregate Limit of Liability for all **Loss** under this Coverage Part as set forth in ITEM 5.a of the Declarations.

**B.**     No retention amount will apply to **Investigation Costs** payable under this Coverage Part.


**Section VIII.  Order of Payments**

**A.**     **Loss**, including **Costs of Defense**, covered under this Coverage Part will be paid by the Insurer in the following order:

   1.     first, the Insurer will pay such **Loss**, including **Costs of Defense**, covered under INSURING AGREEMENT A of this Coverage Part;

   2.     with respect to whatever amount of the Insurer's Limit of Liability under this Coverage Part remains after the payment of **Loss**, including **Costs of Defense**, covered under INSURING AGREEMENT A of this Coverage Part, the Insurer will then pay such **Loss**, including **Costs of Defense**, covered under INSURING AGREEMENT B of this Coverage Part; and

   3.     with respect to whatever amount of the Insurer's Limit of Liability under this Coverage Part remains after the payment of **Loss**, including **Costs of Defense**, covered under INSURING AGREEMENTS A and B of this Coverage Part, the Insurer will then pay such **Loss**, including **Costs of Defense**, covered under INSURING AGREEMENT C of this Coverage Part; and

   4.     with respect to whatever amount of the Insurer's Limit of Liability under this Coverage Part remains after the payment of **Loss**, including **Costs of Defense**, covered under INSURING AGREEMENTS A, B and C of this Coverage Part, the Insurer will then pay such other **Loss**, including **Costs of Defense**, covered under this Coverage Part.

**B.**     Nothing in this Section VIII is intended, nor shall it be construed, to increase the Insurer's maximum aggregate Limit of Liability applicable to **Loss**, including **Costs of Defense**, under this Coverage Part.

# EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

### THIS IS A CLAIMS-MADE POLICY
### WITH COSTS OF DEFENSE INCLUDED IN THE LIMIT OF LIABILITY.
### PLEASE READ THE ENTIRE POLICY CAREFULLY.

In consideration of the payment of the premium and in reliance upon all statements made and information furnished to the insurance company shown in the Declarations (the "Insurer"), including the statements made in the **Proposal Form**, and subject to all terms, conditions and limitations of this Policy, the **Insureds** and the Insurer agree:

**Section I.  Insuring Agreement**

The Insurer will pay to or on behalf of the **Insureds** all **Loss** which the **Insureds** are legally obligated to pay as a result of a **Claim** first made against the **Insureds** during the **Policy Period** or the Discovery Period, if purchased, for a **Wrongful Act** by an **Insured** in his, her or its capacity as such.

**Section II.  Definitions**

**A.**     For purposes of this Coverage Part, the term **"Claim"** will include a formal administrative or regulatory proceeding by or before the Equal Employment Opportunity Commission or any similar federal, state or other governmental agency which is commenced by the receipt by an **Insured** of a notice of charges, formal investigative order or similar document and an audit conducted by the Office of Federal Contract Compliance Programs which is commenced the receipt by an **Insured** of a notice of violation, order to show cause or written demand for monetary or injunctive relief, but **Claim** will not include any labor or grievance arbitration or other proceeding which is subject to a collective bargaining agreement.

**B.**     "**Employee**" will mean:

   1.     any individual whom the **Company** compensates by wages, salary and/or commissions and whose labor or service is directed by the **Company**, whether such individual performs such labor or service on a full-time, part-time, seasonal or temporary basis;

   2.     any individual who performs labor or services for the **Company** as a volunteer;

   3.     any individual who is leased or loaned to the **Company** to perform labor or service for the **Company**, but only if the **Company** provides indemnification to such individual in the same manner and to the same extent as to its other **Employees**; and

   4.     any individual contracted to perform work for the **Company** or who is an independent contractor for the **Company**, but only if, prior to any **Claim** against such individual, the **Company** shall have agreed in writing to provide indemnification to such individual for matters within the scope of coverage of this Coverage Part, and the **Company** shall have paid any additional premium required by the Insurer in connection with such individual.

**C.**     For purposes of this Coverage Part, the term "**Insured**" will mean the **Company** and all **Insured Persons**.

**D.**     For purposes of this Coverage Part, the term "**Insured Person**" will mean:

   1.     any duly elected or appointed principal, partner, director, officer, trustee, in-house general counsel, risk manager or member of the board of managers or management committee of the **Company**;

2.      any executive of the **Company** located outside of the United States of America who holds a position with respect to the **Company** equivalent to any position described in Sections II.D.1 above; or

3.      any **Employee**.

**E.**      For purposes of this Coverage Part, the term "**Loss**" will include awards of front pay and back pay and liquidated damages awarded pursuant to the Age Discrimination in Employment Act or the Equal Pay Act, but **Loss** will not include:

1.      any costs associated with the modification of any building or property to provide any reasonable accommodations required by or made as a result of or to conform with the requirements of the Americans with Disabilities Act, the Civil Rights Act of 1964 or any similar federal, state or local law; or

2.      any compensation, including benefits, for any person hired, promoted or reinstated pursuant to a judgment settlement, order or other resolution of a Claim.

**F.**      "**Third Party Wrongful Act**" will mean any actual or alleged:

1.      discrimination against any natural person, other than an **Employee** or applicant for employment with the **Company**, who is a customer, vendor, service provider or other business invitee of the **Company**, based on such person's age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, pregnancy, disability, HIV or other health status, Vietnam Era veteran or other military status, or other protected status or characteristic under federal, state or local law; or

2.      sexual harassment, including unwelcome sexual advances, requests for sexual favors or other offensive conduct of a sexual nature, against any natural person, other than an **Employee** or applicant for employment with the **Company**, who is a customer, vendor, service provider or other business invitee of the **Company**.

**G.**      For purposes of this Coverage Part, the term "**Wrongful Act**" will mean:

1.      any actual or alleged:

    a.      wrongful dismissal, discharge or termination (whether actual, constructive or retaliatory) of employment, wrongful failure or refusal to hire or promote, wrongful discipline or demotion, wrongful deprivation of career opportunity, negligent employment evaluation or failure to grant tenure;

    b.      sexual or other workplace harassment, including quid pro quo and hostile work environment;

    c.      unlawful employment discrimination, including discrimination based on a person's age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, pregnancy, disability, HIV or other health status, Vietnam Era veteran or other military status, or other protected status or characteristic under federal, state or local law, including but not limited to:

- Title VII of the Civil Rights Act of 1964;
- the Equal Pay Act of 1963;
- the Age Discrimination Act of 1967;
- Sections 501 and 502 of the Rehabilitation Act of 1973;
- the Uniformed Services Employment and Reemployment Rights Act; and
- Titles I and IV of the Americans with Disabilities Act of 1990;

    d.      employment-related invasion of privacy, defamation (including libel and slander) or negligent or intentional infliction of emotional distress;

e.      failure of the **Company** to create, provide for or enforce adequate or consistent employment-related policies;

f.      retaliatory treatment on account of an **Employee's** exercise or attempted exercise of his or her employment-related rights under law, including but not limited to Sections 806 and 1107 of the Sarbanes-Oxley Act of 2002;

g.      violation of employment-related civil rights relating to any of the above; or

h.      violation of the Family and Medical Leave Act of 1993;

committed or attempted, or allegedly committed or attempted, with respect to an **Employee** or an applicant for employment with the **Company**; and

2.      if it is stated in ITEM 4 of the Declarations that the Optional Third Party Coverage under this Coverage Part has been purchased, any **Third Party Wrongful Act**.

## Section III.  Exclusions

A.      The Insurer will not be liable under this Coverage Part to make any payment of **Loss**, including **Costs of Defense**, in connection with any **Claim** made against any **Insured**:

1.      brought about or contributed to by:

a.      the gaining by any **Insured** of any profit, advantage or remuneration to which such **Insured** was not legally entitled; or

b.      the deliberately fraudulent or criminal acts of any **Insured**;

provided, however, this exclusion will apply only if it is finally adjudicated that such conduct in fact occurred;

2.      based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any **Wrongful Act** or **Related Wrongful Act** or any fact, circumstance or situation which has been the subject of any notice given under any other policy of which this Coverage Part is a renewal or replacement;

3.      based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any prior and/or pending civil, criminal, administrative or investigative proceeding or Office of Federal Contract Compliance Programs audit involving any **Insured** as of the Prior and Pending Date stated in ITEM 7 of the Declarations, or any fact, circumstance or situation underlying or alleged in any such proceeding or audit;

4.      for any actual or alleged;

a.      bodily injury, sickness, disease or death of any person (other than employment-related mental anguish, emotional distress or humiliation), invasion of privacy, trespass, nuisance, wrongful entry or eviction, assault, battery, loss of consortium, false arrest, false imprisonment, malicious prosecution or abuse of process; or

b.      damage to or destruction of any tangible property, including the loss of use thereof;

5.      based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any **Insured Person's** activities as an employee, director, officer, trustee, regent, governor or equivalent executive of any employee trust, charitable or other organization, corporation, company or business other than the **Company**;

6.      for recovery of any amounts owing under, or assumed by any **Insured** pursuant to, any contract with an independent contractor,  express contract of employment or any express obligation to make payments in the event of a termination of employment; provided, that this exclusion will not apply to liability which an **Insured** would have had in the absence of such express contract or obligation;

7.      based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any stock, stock options or stock appreciation rights, whether vested or unvested, including without limitation restricted stock, to which any claimant is or is alleged to be entitled pursuant to a plan or agreement with the **Company**;

8.      for compensation earned by any claimant in the course of employment but not paid for any reason by the **Company**, including any unpaid salary, wages, bonuses, overtime, severance pay, retirement benefits, prerequisites, fringe benefits, vacation days, sick days and medical benefits or insurance to which a claimant is or is alleged to be entitled had the **Company** provided the claimant with a continuation or conversion of such benefits or insurance (or the equivalent value of any such compensation or benefits allegedly earned but not paid);

9       Based upon, arising out of, or attributable to directly or indirectly, in connection with, related to or in any way involving any Claims alleging violations of any federal, state or local wage and hour law;

10.     for any actual or alleged violation of the responsibilities, obligations or duties imposed on any **Insured** by any workers' compensation, unemployment compensation, disability, retirement, social security or other employment benefit statute, rule or law, including but not limited to the Employee Retirement Income Security Act of 1974, the Worker Adjustment and Retraining Notification Act, the Fair Labor Standards Act (except the Equal Pay Act of 1963), the Occupational Safety and Health Act or the Consolidated Omnibus Budget Reconciliation Act of 1985 or any similar state laws; provided, that this exclusion will not apply to any allegation of any retaliatory treatment on account of an **Employee's** exercise or attempted exercise of his or her employment-related rights under any of the foregoing;

11.     based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving actual or alleged seepage, pollution, radiation, emission or contamination of any kind; provided, however, that this exclusion will not apply to any allegation of any retaliatory treatment on account of an **Employee's** exercise or attempted exercise of his or her employment-related rights;

12.     for any **Wrongful Act** of any **Subsidiary** or the **Insured Persons** of such **Subsidiary** or any entity that merges with the **Company** or the **Insured Persons** of such entity that merges with the **Company** occurring:

    a.      prior to the date such entity became a **Subsidiary** or was merged with the **Company**;

    b.      subsequent to the date such entity became a **Subsidiary** or was merged with the **Company** which, together with a **Wrongful Act** occurring prior to the date such entity became a **Subsidiary** or was merged with the **Company**, would constitute **Related Wrongful Acts**; or

    c.      subsequent to the date the **Corporation** ceased to own, directly or indirectly, more than fifty percent (50%) of the voting stock of such **Subsidiary**;

**B.**   The Insurer will not be liable under the Optional Third Party Coverage under this Coverage Part, if purchased, to make any payment of **Loss**, including **Costs of Defense**, in connection with any **Claim** made against any **Insured** for any **Third Party Wrongful Act** based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any actual or alleged price fixing, restraint of trade, monopolization, unfair trade practices or violation of the Federal Trade

Commission Act, the Sherman Anti-Trust Act, the Clayton Act, or any other statute or law regulating anti-trust, monopoly, price fixing, price discrimination, predatory pricing or activities in restraint of trade.

**C.**    For the purpose of determining the applicability of the foregoing exclusions, no **Wrongful Act** of any **Insured Person** shall be imputed to any other **Insured Person**. The **Wrongful Acts** of any past, present or future chairman of the board, president, chief executive officer, chief operating officer or chief financial officer of the **Company** shall be imputed to the **Company**.

## Section IV.  Coordination of Coverage

**A.**    If a **Claim** made against the **Insureds** is covered under this Coverage Part and under any other Coverage Part forming a part of this Policy, the Insurer will first pay **Loss**, including **Costs of Defense**, in connection with such **Claim** under this Coverage Part, and then, with respect to whatever amount of the Insurer's limit of liability under this Policy remains after the payment of **Loss**, including **Costs of Defense**, covered under this Coverage Part, the Insurer will pay such **Loss**, including **Costs of Defense**, which is covered under any other Coverage Part forming a part of this Policy.

**B.**    If notice of a **Claim** has been given under any other Coverage Part forming a part of this Policy and the Insurer determines that such **Claim** would be covered under this Coverage Part had notice been given hereunder, the **Insureds** will be deemed to have given notice of such **Claim** under this Coverage Part at the same time that notice of such **Claim** was given under such other Coverage Part.

## Section V.  Waiver of Retention under Certain Circumstances

No retention will apply under this Coverage Part to **Loss**, including **Costs of Defense**, incurred by the **Insured Persons** if advancement or indemnification of such **Loss** by the **Company** is neither required nor permitted under applicable law or, if advancement or indemnification of such **Loss** by the **Company** is required or permitted under applicable law, such advancement or indemnification is not made solely by reason of the **Company's Financial Insolvency**.

## Section VI.  Investigation and Settlement

The Insurer shall have the right but not the obligation to make any investigation it deems expedient and with the consent of the **Insureds** against whom the **Claim** has been made or the **Company** on behalf of the **Insureds**,  make settlement within the available Limit of Liability applicable to this Coverage Part (whether above or below the applicable Retention). If the **Insureds**, or the **Company** on behalf of the **Insureds**, shall refuse to consent to any settlement recommended by the Insurer and shall act to contest or continue any actions or proceedings in connection with such **Claim**, then, subject to the available Limit of Liability and the applicable Retention, the Insurer's liability for all **Loss** in connection with such **Claim** shall not exceed the amount for which the **Claim** could have been settled, plus the reasonable **Costs of Defense** incurred with the Insurer's consent up to the date of refusal to consent by the **Insured** and/or the **Company**.

# FIDUCIARY LIABILITY COVERAGE PART

### THIS IS A CLAIMS-MADE POLICY
### WITH COSTS OF DEFENSE INCLUDED IN THE LIMIT OF LIABILITY.
### PLEASE READ THE ENTIRE POLICY CAREFULLY.

In consideration of the payment of the premium and in reliance upon all statements made and information furnished to the insurance company shown in the Declarations (the "Insurer"), including the statements made in the **Proposal Form**, and subject to all terms, conditions and limitations of this Policy, the **Insureds** and the Insurer agree:

## Section I.  Insuring Agreements

**A.**    The Insurer will pay to or on behalf of the **Insureds Damages** and **Costs of Defense** which the **Insureds** are legally obligated to pay as a result of a **Claim** first made against them during the **Policy Period** or the Discovery Period, if purchased, for a **Wrongful Act** by the **Insureds** or by any person or entity for whose **Wrongful Acts** the **Insureds** are or are alleged to be legally responsible.

**B.**    If it is stated in ITEM 4 of the Declarations that the Optional Settlement Program Coverage under this Coverage Part has been purchased, the Insurer will pay to or on behalf of the **Insureds** those **Settlement Program Expenditures** incurred by the **Insureds** as a result of correcting an **Insured's** unintentional noncompliance with any federal statute, rule or regulation applicable to a **Plan**, but only if such unintentional noncompliance first becomes known to the **Insureds** during the **Policy Period** or the Discovery Period, if purchased.

## Section II.  Definitions

**A.**    "**Administration**" will mean giving advice to participants and beneficiaries with respect to any **Plan**, interpreting any **Plan**, handling records in connection with any **Plan**, or effecting enrollment, termination or cancellation of participants under any **Plan**.

**B.**    For purposes of this Coverage Part, the term "**Claim**" will include a written notice received by an **Insured** from the Department of Labor or the Pension Benefit Guaranty Corporation of the commencement of an investigation.

**C.**    "**Damages**" will mean monetary damages (including punitive or exemplary damages and the multiple portion of any multiple damage award if and to the extent that such damages are insurable under the law of that jurisdiction applicable to the **Claim** giving rise to such damages that is most favorable to the insurability thereof), judgments (including pre- and post-judgment interest, if any) or settlements which an **Insured** is legally obligated to pay as a result of a **Claim**; provided, that **Damages** will not include any fines, taxes or penalties other than:

    1.    civil penalties or excise tax imposed pursuant to Section 502(c) of the Employee Retirement Income Security Act of 1974 ("ERISA") and the Pension Protection Act of 2006;

    2.    civil penalties of up to five percent (5%) imposed pursuant to Section 502(i) of ERISA;

    3.    civil penalties of up to twenty percent (20%) of any settlement or judgment imposed pursuant to Section 502(l) of ERISA for breach of fiduciary duty; and

    4.    civil fines and penalties imposed pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

**D.**    For purposes of this Coverage Part, the term "**Insured**" will mean:

    1.    any **Plan**;

2.      the **Company**;

3.      the **Insured Persons**; and

4.      any other entity or natural person designated as an additional **Insured** by written endorsement to this Coverage Part.

E.      For purposes of this Coverage Part, the term "**Insured Person**" will mean:

1.      with respect to any **Plan** or entity included within the term "**Company**," any natural person who at any time holds or shall have held the position of director, officer, trustee, governor, management committee member, in-house general counsel or employee thereof;

2.      with respect to any entity included within the term "**Company**" that is a limited liability company, any natural person who at any time holds or shall have held the position of manager, member of the Board of Managers or equivalent executive thereof;

3.      with respect to any entity included within the term "**Company**" that is a partnership, any natural person who at any time holds or shall have held the position of general partner thereof; and

4.      with respect to any entity included within the term "**Company**" organized or chartered in any jurisdiction other than the United States, any natural person who at any time holds or shall have held any position equivalent to any position described in Section II.E.1, 2 or 3 above.

F.      For purposes of this Coverage Part, the term "**Loss**" will mean **Damages**, **Costs of Defense** and, if it is stated in ITEM 4 of the Declarations that the Optional Settlement Program Coverage under this Coverage Part has been purchased, **Settlement Program Expenditures**; provided, that the term "**Loss**" will not include:

1.      salaries, wages, overhead or benefit expenses associated with any **Insured**; or

2.      any matter which may be deemed uninsurable under the law pursuant to which this Coverage Part is construed.

G.      "**Pension Benefit Plan**" will mean any employee pension benefit plan, as defined in Section 3 of ERISA.

H.      "**Plan**"    will mean:

1.      any **Pension Benefit Plan** or **Welfare Benefit Plan** which is operated solely by the **Company** or jointly by the **Company** and a labor organization solely for the benefit of the **Company's** directors, officers, trustees, governors, management committee members, managers, members of the Board of Managers, general partners, in-house general counsel or employees located anywhere in the world;

2.      any other employee benefit plan or program anywhere in the world which is not subject to ERISA and which is sponsored by the **Company** solely for the benefit of its directors, officers, trustees, governors, management committee members, managers, members of the Board of Managers, general partners, in-house general counsel or employees, including but not limited to any cafeteria plan, dependent care assistance program, fringe benefit plan, deferred compensation plan, supplemental executive retirement plan, top-hat plan, excess benefit plan or voluntary employees' beneficiary association;

3.      any other plan or program otherwise described in Section II.H.1 or 2 above while such plan or program is being actively developed, formed or proposed by the **Company** prior to the formal creation of such plan or program; provided, that no coverage will be afforded under this Coverage Part in respect of any **Claim** against any **Insured** in a settlor or similar uninsured capacity with respect to any such plan or program; and

4.     any other plan, fund or program specifically identified as a **Plan** by written endorsement attached to and made a part of this Coverage Part.

However, **Plan** will not include any multi-employee plan as that term is defined by ERISA.

**I.**     "**Settlement Program**" will mean any voluntary compliance resolution program or similar voluntary settlement program administered by the U.S. Internal Revenue Service or the U.S. Department of Labor, including but not limited to the Employee Plans Compliance Resolution System, the Audit Closing Agreement program, the Voluntary Compliance Resolution Program, the Walk-In Closing Agreement Program, the Administrative Policy Regarding Self-Correction, the Tax Sheltered Annuity Voluntary Correction Program, the Delinquent Filer Voluntary Compliance Program and the Voluntary Fiduciary Correction Program.

**J.**     "**Settlement Program Expenditures**" will mean:

1.     reasonable costs, charges and expenses of attorneys, accountants and/or other professionals that are incurred solely in investigating and evaluating a **Plan's** unintentional noncompliance with any federal statute, rule or regulation applicable to such **Plan** and effecting a resolution thereof pursuant to a **Settlement Program**; and

2.     any fees, fines, penalties or sanctions paid by an **Insured** to a governmental authority pursuant to a **Settlement Program** as a result of a **Plan's** unintentional noncompliance with any federal statute, rule or regulation applicable to such **Plan** and, subject to the Insurer's approval, costs to correct a **Plan's** unintentional noncompliance with any federal statute, rule or regulation applicable to such **Plan** that are incurred by the **Plan** in connection with its participation in a **Settlement Program**.

**K.**     "**Welfare Benefit Plan**" will mean any employee welfare benefit plan, as such term is defined in Section 3 of ERISA.

**L.**     For purposes of this Coverage Part, the term "**Wrongful Act**" will mean:

1.     any actual or alleged breach of the responsibilities, obligations or duties imposed upon fiduciaries of a **Plan** by ERISA, HIPAA, the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), any amendments to any of the foregoing, the common or statutory law of any jurisdiction, domestic or foreign, governing such **Plan**, or any rules or regulations promulgated under any of the foregoing;

2.     any violation of HIPAA claimed against any **Insured** due solely to such **Insured's** service as fiduciary of any **Plan**;

3.     any negligent act, error or omission by any **Insured** in the **Administration** of any **Plan**:

4.     any other matter claimed against an **Insured Person** due solely to such **Insured Person's** service as fiduciary of any **Plan**.

## Section III.  Exclusions

**A.**     The Insurer will not be liable under this Coverage Part to make any payment of **Loss**, including **Costs of Defense**, in connection with any **Claim** made against any **Insured**:

1.     based upon, arising from or in consequence of any dishonest, fraudulent or criminal act or omission or any willful violation of any statute, rule or law by such **Insured**, or by the gaining in fact by such **Insured** of any profit, remuneration or advantage to which such **Insured** is not legally entitled, if such dishonest, fraudulent or criminal act or omission, willful violation of statute, rule or law or the gaining in fact of such profit, remuneration or advantage shall have been established by a judgment or other final adjudication adverse to such **Insured**;

2.      for any actual or alleged:

      a.      bodily injury, sickness, disease or death of any person, mental anguish, emotional distress, invasion of privacy, trespass, nuisance, wrongful entry or eviction, assault, battery, loss of consortium, false arrest, false imprisonment, malicious prosecution, abuse of process, libel, defamation or slander; or

      b.      damage to or destruction of any tangible property, including the loss of use thereof;

3.      based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving actual or alleged seepage, pollution, radiation, emission or contamination of any kind; including but not limited to any financial loss to any **Insured** or any beneficiaries, security holders or creditors thereof based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any matter described in this exclusion;

4.      based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any actual or alleged negligent act, error or omission in the **Administration** of, or failure to comply with any law concerning, workers' compensation, unemployment insurance, Social Security or disability benefits, any amendments thereto, any similar provisions of any federal, state or local statutory or common law anywhere in the world or any rules or regulations promulgated under any of the foregoing, whether or not such failure to comply is willful; provided, that this exclusion will not apply to any actual or alleged failure by any **Insured** to comply with any provision of COBRA, HIPAA, any amendments thereto or any rules or regulations promulgated thereunder;

5.      based upon, arising from or in consequence of any liability of others assumed by any **Insured** under any contract or agreement, whether oral or written, other than an agreement or declaration of trust or similar agreement creating or establishing a **Plan;** provided, that this exclusion will not apply to the extent that an **Insured** would have been liable in the absence of such contract or agreement; or

6.      based upon, arising from or in consequence of:

      a.      any act, error, omission, fact, circumstance, situation, transaction, event, decision, **Wrongful Act** or **Related Wrongful Act** which has been the subject of any notice given under any policy of which this Coverage Part is a renewal or replacement, or

      b.      any prior and/or pending civil, criminal, administrative or investigative proceeding involving any **Insured** as of the Prior and Pending Date stated in ITEM 7 of the Declarations, or any fact, circumstance or situation underlying or alleged in such proceeding.

**B.**      The Insurer will not be liable under this Coverage Part to make any payment of **Damages**:

1.      which constitute the return to any employer of any contributions if such amounts are or could be chargeable to a **Plan**;

2.      which constitute benefits due or to become due under the terms of any **Plan** or which would be due under any **Plan** if such **Plan** were in compliance with all applicable law, except and then only if and to the extent that recovery for such benefits is based on a **Wrongful Act** by an **Insured Person** and is payable solely as the personal obligation of such **Insured Person**; or

3.      based upon, arising from or in any way related to a failure to fund, or to collect contributions owed to, any **Plan;**

provided, that this Section III.B will not limit any right and duty on the part of the Insurer to defend any such **Claim** or the Insurer's obligation to pay **Costs of Defense** in connection therewith.

**C.**     The Insurer will not be liable under the Optional Settlement Program Coverage under this Coverage Part, if purchased, to make any payment of fees, fines, penalties or sanctions relating to a **Plan** if, as of the earlier of the inception date of this Policy as stated in ITEM 2 of the Declarations or the inception date of any policy of insurance issued by the Insurer of which this Coverage Part is a renewal or replacement, any **Insured Person** knew of the actual or alleged noncompliance of such **Plan** with any statute, rule or regulation in respect of which such fees, fines, penalties or sanctions are owed.

**D.**     No **Wrongful Act** of any **Insured** will be imputed to any other **Insured** to determine the application of any of the above exclusions.

### Section IV.  Waiver of Retention

No retention will apply under this Coverage Part to **Loss**, including **Costs of Defense**, incurred by the **Insured Persons** if advancement or indemnification of such **Loss** by the **Company** is neither required nor permitted under applicable law or, if advancement or indemnification of such **Loss** by the **Company** is required or permitted under applicable law, such advancement or indemnification is not made solely by reason of the **Company's Financial Insolvency**.

### Section V.  Sub-Limit of Liability and Retention Applicable to Settlement Program Expenditures

If it is stated in ITEM 4 of the Declarations that the Optional Settlement Program Coverage under this Coverage Part has been purchased:

**A.**     The Insurer's maximum aggregate limit of liability for **Settlement Program Expenditures** will be the amount set forth in ITEM 5.c.i of the Declarations, which amount will be part of, and not in addition to, the Insurer's maximum aggregate limit of liability for all **Loss** under this Coverage Part as set forth in ITEM 5.c of the Declarations.

**B.**     No retention amount will apply to **Settlement Program Expenditures** payable under this Coverage Part.

### Section VI.  Discovery Period

If it is stated in ITEM 4 of the Declarations that the Optional Settlement Program Coverage under this Coverage Part has been purchased and the **Insureds** purchase a Discovery Period pursuant to Section III.A of the GENERAL TERMS AND CONDITIONS of this Policy, such Discovery Period will also provide coverage for **Settlement Program Expenditures** incurred by **Insureds** as a result of the **Insureds'** participation during the Discovery Period in a **Settlement Program**, but only if such participation commences during the Discovery Period and involves a **Plan's** unintentional noncompliance with any federal statute, rule or regulation applicable to such **Plan** actually or allegedly taking place before the effective date of the Policy's termination or non-renewal.  The Insurer's limit of liability for **Settlement Program Expenditures** incurred by **Insureds** as a result of the **Insureds'** participation during the Discovery Period in a **Settlement Program** will be part of, and not in addition to, the Insurer's maximum aggregate limit of liability for all **Settlement Program Expenditures** under this Coverage Part, which, in turn, will be part of, and not in addition to, the Insurer's maximum aggregate limit of liability for all **Loss** under this Coverage Part.

### Section VII.  Notice

If it is stated in ITEM 4 of the Declarations that the Optional Settlement Program Coverage under this Coverage Part has been purchased, then, as a condition precedent to exercising their rights under INSURING AGREEMENT B of this Coverage Part, the **Insureds** must give the Insurer written notice of their participation or intent to participate in a **Settlement Program** as soon as practicable after the **Insureds** first become aware of any unintentional noncompliance with any federal statute, rule or regulation applicable to any **Plan**,  but in no event later than the expiration date of the Policy. The Insurer will not be liable under INSURING AGREEMENT B for any **Settlement Program Expenditures** incurred in connection with any **Settlement Program** before such written notice has been given to the Insurer.

**Section VIII.  Changes in Exposure**

**A.**     If, during the **Policy Period**, a **Plan** merges into or consolidates with another trust or plan not included within the term "**Plan**" such that such **Plan** is not the surviving entity, written notice thereof must be provided to the Insurer as soon as practicable.  Coverage under this Coverage Part will continue in full force and effect with respect to **Claims** for **Wrongful Acts** with respect to such **Plan** committed, attempted or allegedly committed or attempted before such event by any **Insured** or by any person or entity for whose **Wrongful Acts** the **Insureds** are legally responsible, and for the **Insureds'** participation in **Settlement Programs** in respect of any such **Plan's** actual or alleged noncompliance with any statute, rule or regulation before such event.  However, coverage under this Coverage Part will cease with respect to **Claims** for **Wrongful Acts** with respect to such **Plan** committed, attempted or allegedly committed or attempted after such event by any **Insured** or by any person or entity for whose **Wrongful Acts** any **Insured** is legally responsible and for the **Insureds'** participation in **Settlement Programs** in respect of any such **Plan's** actual or alleged noncompliance with any statute, rule or regulation after such event.

**B.**     If, during the **Policy Period**, the responsibility for the administration of a **Plan** is fully assumed by another person, entity or group of persons or entities, written notice thereof must be provided to the Insurer as soon as practicable.  Coverage under this Coverage Part will continue in full force and effect with respect to **Claims** for **Wrongful Acts** with respect to such **Plan** committed, attempted or allegedly committed or attempted before such event by any natural person **Insured** prior to such transfer of responsibilities or by any person or entity for whose **Wrongful Acts** any natural person **Insured** is legally responsible, and for such natural person **Insureds'** participation in **Settlement Programs** in respect of any such **Plan's** actual or alleged noncompliance with any statute, rule or regulation before such event.  However, coverage under this Coverage Part will cease with respect to **Claims** for **Wrongful Acts** with respect to such **Plan** committed, attempted or allegedly committed or attempted after such event by any natural person **Insured** or by any person or entity for whose **Wrongful Acts** any natural person **Insured** is legally responsible, and for such natural person **Insureds'** participation in **Settlement Programs** in respect of any such **Plan's** actual or alleged noncompliance with any statute, rule or regulation after such event.

**C.**     If, during the **Policy Period**, the **Company** acquires the assets of another entity or acquires a **Subsidiary** or any other entity, by merger, acquisition or otherwise, no coverage will be available under this Coverage Part in respect of any **Pension Benefit Plan** of any such entity or any trust established to hold any assets of such **Pension Benefit Plan** or any **Insureds** with respect to any such **Pension Benefit Plan** or trust unless written notice of such acquisition is given to the Insurer, together with such additional information as the Insurer may request, as soon as practicable after the effective date and time of such acquisition and the Insurer agrees by written endorsement to this Coverage Part to provide such coverage on such terms, conditions and limitations, and for such additional premium, as the Insurer may require.

**Section IX.  Waiver of Right of Recourse**

If any premium for this Coverage Part is paid out of the assets of a **Plan**, the Insurer will have the right of recourse required by Section 410(b)(1) of ERISA, unless an **Insured** other than a **Plan** shall have paid the additional Waiver of Recourse Premium set forth in ITEM 9 of the Declarations.

**Section X.  No Fiduciary Status for Insurer**

Nothing in this Coverage Part is intended, nor should it be construed:

**A.**     to give or allow the Insurer to exercise any authority or control respecting the management of any **Plan,** any authority or control respecting the management or disposition of any **Plan's** assets, or any authority or responsibility in the **Administration** of any **Plan**;

**B.**     to create any legal relationship between the Insurer and any beneficiary of or participant in any **Plan** or any obligation on the part of the Insurer to make any payment or reimbursement directly to any beneficiary of or participant in any **Plan**; or

**C.**     to cause the Insurer to be treated as a fiduciary, as defined in Section (3)(21) of ERISA, with respect to any **Plan**.

**In Witness Whereof,** the issuing Company has caused this policy to be signed officially below and
countersigned on the Declarations page by a duly authorized representative of said Company.


Emily B. Miner                                     Stanley A. Galanski
Secretary                                          President

Navigators Insurance Company

**Employment Practices Liability Loss Control**

Navigators is pleased to announce that Jackson Lewis is our new Risk Management partner.  As one of the nation's largest and finest employment law firms providing representation to management in the defense of harassment, discrimination, wrongful discharge or other workplace related claims, Jackson Lewis brings to the table such preventive services as a toll-free hotline, website information and regular risk management publications which provide our insureds with the most current and concise information available.

With over 750 attorneys working in the firm's 53 offices throughout the United States, Jackson Lewis has the national scope and broad geographical expertise to work with our insureds on a timely and helpful basis.

Some of the things you can expect from Jackson Lewis include:

- An 800 # "hotline" to discuss employment matters with experienced employment law counsel (866-758-6874)

- Access to Jackson Lewis' web-based information, 24 hours a day

- Access to "*Preventive Strategies*," Jackson Lewis' quarterly newsletter

- Complementary attendance at Jackson Lewis human resources and employment law breakfast and lunch seminars

In addition, Jackson Lewis will provide at a discounted rate the following services:

- Development or review of employee handbooks and other employment practices documentation

- Presentation of supervisory training programs addressing harassment, discrimination and other employment issues

- Risk management audits of wage-hour and overtime practices; harassment avoidance programs; union-avoidance programs; recordkeeping and other compliance efforts; and, other aspects of your Company's employment practices

To utilize Jackson Lewis' risk management services, please contact James J. Panzini, Esq., a member of Jackson Lewis LLP, at (973) 451-6349 or panzinij@jacksonlewis.com.

**ENDORSEMENT NO.:  1**

**This endorsement, effective 12:01 am, December 31, 2013**

**Forms part of policy number:  CH13DOL610110IV**

**Issued to:  Vizio Inc**

**By:  Navigators Insurance Company**

# OFAC ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**U.S. ECONOMIC AND TRADE SANCTIONS LIMITATIONS CLAUSE**

No insurer shall be deemed to provide cover and no insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that insurer to any sanction, prohibition or restriction under the trade or economic sanctions, laws or regulations of the United States of America.

The United States of America trade or economic sanctions, laws or regulations shall include, but not be limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC).

All other terms, conditions and exclusions of this Policy remain unchanged.

ENDORSEMENT NO.:  2

This endorsement, effective 12:01 am, December 31, 2013

Forms part of policy number:  CH13DOL610110IV

Issued to:  Vizio Inc

By:  Navigators Insurance Company

### CALIFORNIA CHANGES  - CANCELLATION AND NONRENEWAL

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**l.**   **Section VIII., General Conditions, E. Cancellation or Nonrenewal** of the **General Terms and Conditions**, the following is deleted and replaced

**CANCELLATION**

**1.**   This Policy may be cancelled by the **Corporation** at any time by written notice to the insurer.  Upon cancellation, the **Insurer** shall retain the customary short rate portion of the premium.  Return or tender of any unearned premium will not be a condition of cancellation.  This Policy may be cancelled by the Insurer only for non-payment of premium.

**2.**   The **Insurer** may cancel this Policy, for only one or more of the following reasons, by mailing or delivering to the first **Named Insured** at the mailing address shown in the Policy and to the producer of record, advance written notice of cancellation, stating the reason for cancellation:

   **(a)**   Nonpayment of premium, including payment due on a prior policy we issued and due during the current policy term covering the same risks.
   **(b)**   A determination by the Commissioner of Insurance that the continuation of the policy coverage would place us in violation of California law or the laws of the state where we are domiciled or would threaten our solvency.

**3.**   The **Insurer** will mail or deliver advance written notice of cancellation, stating the reason for cancellation, to the first **Named Insured** at the mailing address shown in the policy and to the producer of record at least:

   **(a)**   10 days before the effective date of cancellation if we cancel for nonpayment of premium; or
   **(b)**   30 days before the effective date of cancellation if we cancel due to a determination by the Commissioner of Insurance that the continuation of the policy coverage would place us in violation of California law or the laws of the state where we are domiciled or would threaten our solvency.

**ENDORSEMENT NO.:  2**

**II.**   The following is added and supersedes any provisions to the contrary:

**NONRENEWAL**

**1.**   Subject to the provisions of Paragraph **2.** below, if the insurer elects not to renew this Policy, the insurer will mail or deliver written notice stating the reason for nonrenewal to the first **Named Insured** shown in the Declarations and to the producer of record, at least 60 days, but not more than 120 days, before the expiration or anniversary date.

The insurer will mail or deliver the notice to the first **Named Insured** and to the producer of record at the mailing address shown in the Policy.

**2.**   The **Insurer** is not required to send notice of nonrenewal in the following situations:

   **(a)**  If the transfer or renewal of a policy, without any changes in terms, conditions, or rates, is between us and a member of our insurance group.
   (b)  If the policy has been extended for 90 days or less, provided that notice has been given in accordance with Paragraph **1** prior to the extension.
   **(c)**  If you have obtained replacement coverage, or if the first **Named Insured** has agreed, in writing, within 60 days of the termination of the Policy, to obtain that coverage.
   **(d)**  If the Policy is for a period of no more than 60 days and you are notified at the time of issuance that it will not be renewed.
   **(e)**  If the first Named Insured requests a change in the terms or conditions or risks covered by the Policy within 60 days of the end of the **Policy Period**.
   **(f)**  If the insurer has made a written offer to the first Named Insured, in accordance with the time frames shown in Paragraph **1.**, to renew the Policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.

All other terms and conditions of this Policy remain unchanged.

ENDORSEMENT NO.:  3

**This endorsement, effective 12:01 am, December 31, 2013**

**Forms part of policy number:  CH13DOL610110IV**

**Issued to:  Vizio Inc**

**By:  Navigators Insurance Company**

### CALIFORNIA PUNITIVE DAMAGES EXCLUSION

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

Notwithstanding anything in this policy to the contrary, it is understood and agreed that the following exclusion forms part of the policy:

Punitive or Exemplary Damages  - The Insurer will not be liable to make any payment for punitive damages or exemplary damages or the multiplied damage award.

This policy is hereby amended to be consistent with this provision.

All other terms and conditions of this Policy remain unchanged.

**ENDORSEMENT NO.:  4**

**This endorsement, effective 12:01 am, December 31, 2013**

**Forms part of policy number:  CH13DOL610110IV**

**Issued to:  Vizio Inc**

**By:  Navigators Insurance Company**

**STATE AMENDATORY INCONSISTENCY**

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

It is hereby agreed and understood that **Section VIII**. **General Conditions**; is amended by adding the following,

**State Amendatory Inconsistency**

In consideration of the premium charged, it is hereby understood and agreed that in the event that there is an inconsistency between a state amendatory endorsement attached to this policy and any term or condition of this policy, then it is understood and agreed that, where permitted by law and the public policy of the state of domicile, the **Insurer** shall apply those terms and conditions of either the amendatory endorsement or the policy which are more favorable to the **Insured**.

All other terms and conditions of this Policy remain unchanged.

ENDORSEMENT NO.:  5

**This endorsement, effective 12:01 am, December 31, 2013**

**Forms part of policy number:  CH13DOL610110IV**

**Issued to:  Vizio Inc**

**By:  Navigators Insurance Company**

### AMEND SECTION II., B. EMPLOYEE, 4

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

It is understood and agreed that **Section II. Definitions, B., "Employee" 4**., of the **Employment Practices Liability Coverage Part**, is deleted in its entirety and replaced with the following:

4.      any individual contracted to perform work for the **Company** or who is an independent contractor for the **Company**, provided they are indemnified by the **Company**.

All other terms and conditions of this Policy remain unchanged.

**ENDORSEMENT NO.:  6**

**This endorsement, effective 12:01 am, December 31, 2013**

**Forms part of policy number:  CH13DOL610110IV**

**Issued to:  Vizio Inc**

**By:  Navigators Insurance Company**

### NON RESCINDABLE ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

It is agreed that the Policy**,** is amended by adding the following:

It is understood and agreed that this Policy may not be rescinded.

All other terms and conditions of this Policy remain unchanged.

**ENDORSEMENT NO.  7**


**This endorsement, effective 12:01 am, December 31, 2013**

**Forms part of policy number:  CH13DOL610110IV**

**Issued to:  Vizio Inc**

**By:  Navigators Insurance Company**


### AMEND DISCOVERY

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.


It is agreed that **General Terms and Conditions, Section III., Discovery  - Coverage Extensions,  A.,** is deleted in its entirety and replaced with the following:
**Section III.  Discovery  - Coverage Extensions**

A.   In the event the Insurer refuses to renew this Policy or the **Corporation** chooses to cancel or not renew this policy, the **Corporation** will have the right, upon payment of (100%) of the annual premium, (or if the **Policy Period** is other than annual, (100%) of the annualized premium), to an extension of the coverage provided by this Policy with respect to any **Claim** first made against any **Insured** during the period of twelve (12) months after the end of the **Policy Period** (the "Discovery Period"), but only with respect to **Wrongful Acts** committed or attempted, or allegedly committed or attempted, before the end of the **Policy Period**.  As a condition precedent to the right to purchase the Discovery Period, the total premium for this Policy must have been paid, and a written request together with payment of the appropriate premium for the Discovery Period must be provided to the Insurer no later than thirty (30) days after the end of the **Policy Period**.  The purchase of the Discovery Period will not in any way increase any Limit of Liability, or create a separate or additional Limit of Liability, applicable to any Coverage Part or to this Policy as a whole, and the limits of liability with respect to **Claims** made during the Discovery Period will be part of, and not in addition to, the applicable Limit or Limits of liability as set forth in ITEM 5 of the Declarations.


All other terms and conditions of the policy remain unchanged.

**ENDORSEMENT NO.:  8**


**This endorsement, effective 12:01 am, December 31, 2013**

**Forms part of policy number:  CH13DOL610110IV**

**Issued to:  Vizio Inc**

**By:  Navigators Insurance Company**


### AMEND SECTION VIII. CHANGES IN EXPOSURE, G1

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.


It is agreed that **Section VIII. Changes in Exposure, G.1**., of the **General Terms and Conditions**, is amended as follows:

> "twenty-five percent (25%) of the total assets" is deleted in its entirety and replaced with "30%  of the total assets".




All other terms and conditions of this Policy remain unchanged.

ENDORSEMENT NO.:  9

**This endorsement, effective 12:01 am, December 31, 2013**

**Forms part of policy number:  CH13DOL610110IV**

**Issued to:  Vizio Inc**

**By:  Navigators Insurance Company**

### AMENDED SECTION VI., INVESTIGATION AND SETTLEMENT

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

It is understood and agreed that **Section VI. Investigation and Settlement** of **the Employment Practices Liability Coverage Part** is deleted and replaced by the following:

The Insurer shall have the right but not the obligation to make any investigation it deems expedient and with the consent of the **Insureds** against whom the **Claim** has been made or the **Company** on behalf of the **Insureds**,  make settlement within the available Limit of Liability applicable to this Coverage Part (whether above or below the applicable Retention).

If the **Insureds** shall unreasonably withhold or refuse to consent to any settlement or compromise recommended by the Insurer and acceptable to the claimant and elects to contest the **Claim**, the Insurer's liability for any **Loss** shall not exceed: (1)  the amount for which the Insurer could have settled such **Claim** plus **Costs of Defense** incurred as of the date such settlement was proposed in writing by the Insurer, ("Settlement Amount") plus (2)  eighty (80%) of covered **Loss** in excess of such Settlement Amount, it being a condition of this Policy that the remaining twenty (20%)  of such **Loss** excess of the Settlement Amount shall be carried by the **Insured** at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the Settlement Amount exceeds the Retention amount stated in **ITEM 6 Retentions** of the **Declarations Page**.

All other terms and conditions of this Policy remain unchanged.

**ENDORSEMENT NO.:  10**


**This endorsement, effective 12:01 am, December 31, 2013**

**Forms part of policy number:  CH13DOL610110IV**

**Issued to:  Vizio Inc**

**By:  Navigators Insurance Company**

### AMEND SECTION III. EXCLUSIONS A. 8 (D)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY


It is understood and agreed that **Section III. Exclusions, A. 8. (d),** of the **Directors and Officers Coverage Part**, is deleted in its entirety and replaced with the following:

(d)     brought by any **Insured Person** who has neither served in such capacity nor as consultant to any entity included within  the term, "**Company**" for at least two (2)  prior to such **Claim** having been first made;


All other terms and conditions of this Policy remain unchanged.

ENDORSEMENT NO.:  11

**This endorsement, effective 12:01 am, December 31, 2013**

**Forms part of policy number:  CH13DOL610110IV**

**Issued to:  Vizio Inc**

**By:  Navigators Insurance Company**

## MANUSCRIPT ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

Section G is deleted and replaced with:

For purposes of this Coverage Part, the term "**Loss**"  will include pre-and post-judgment interest and, if it is stated in ITEM 4 that Optional Investigation Costs Coverage has been purchased,  **Investigation Costs. "Loss"**  shall not include any portion of damages, judgments or settlements arising out of any **Claim**  alleging that the  **Company**  paid an inadequate price or consideration for the purchase of the **Company's**  securities.

With respect to any  **Claim**  arising out of any Public or Private Offering of Securities of the **Company**,
the Insurer shall not assert that the portion of any settlement and/or  **Costs of Defense**  of that  **Claim** which relates to any alleged violations of Section 11, 12 or 15 of the Securities Act of 1933, as amended, constitutes uninsurable loss and shall treat that portion of such settlement and/or  **Cost of Defense**  as constituting  **Loss**  under the Policy.

**"Loss"**  shall also include "SOX 304 Costs", provided that they arise out of a  **Claim**  for a  **Wrongful Act**.

"SOX 304 Costs" shall mean the reasonable and necessary fees, costs and expenses consented to by the Insurer and incurred by the Chief Executive Officer or Chief Financial Officer or the  **Company**  solely to facilitate the return of amounts required to be repaid by such executive pursuant to Section 304(a) of the Sarbanes-Oxley act of 2002. SOX 304 Costs, however, shall in no event include the payment, return, reimbursement, disgorgement or restitution of any such amounts requested or required to be repaid by such executive pursuant to Section 304(a).

All other terms and conditions of this Policy remain unchanged.

**ENDORSEMENT NO.:  12**

**This endorsement, effective 12:01 am, December 31, 2013**

**Forms part of policy number:  CH13DOL610110IV**

**Issued to:  Vizio Inc**

**By:  Navigators Insurance Company**

**AMEND DEFINITION OF PROPOSAL FORM ENDORSEMENT**

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

It is hereby agreed and understood that the  **Section II. Definitions, L. "Proposal Form"**, of the **General Terms and Conditions Coverage Part**  is amended with the addition of the following:

This shall only apply for the 45 days prior to the inception of the Policy.

All other terms and conditions of this Policy remain unchanged.

**ENDORSEMENT NO.:  13**

**This endorsement, effective 12:01 am, December 31, 2013**

**Forms part of policy number:  CH13DOL610110IV**

**Issued to:  Vizio Inc**

**By:  Navigators Insurance Company**

## AMEND DEFINITON OF ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

It is agreed that  **Section II., Definitions, A. "Claim",**  of the  **General Terms and Conditions Coverage Part**, is amended with the addition of the following:

**4.**  a formal investigation commenced by the filing of a notice of charges, subpoena, formal investigative order or similar document, including a Wells Notice.

All other terms and conditions of this Policy remain unchanged.

**ENDORSEMENT NO.:  14**


**This endorsement, effective 12:01 am, December 31, 2013**

**Forms part of policy number:  CH13DOL610110IV**

**Issued to:  Vizio Inc**

**By:  Navigators Insurance Company**


**AMEND SECTION VII. NOTICE A**
**(General Counsel or Risk Manager Only)**


THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.


It is agreed that **Section VII., Notice, A.,** of the **General Terms and Conditions Coverage Part**, is deleted in its entirety and replaced with the following:

**A.**    The **Insureds** shall, as a precedent to their rights under this Policy, give the Insurer notice in writing of any **Claim** which is first made during the **Policy Period** as soon as practicable after the General Counsel or Risk Manager of the **Company**, or their equivalent becomes aware of such **Claim**, but in no event later than ninety (90) days after the end of the **Policy Period.**


All other terms and conditions of this Policy remain unchanged.

**ENDORSEMENT NO.:  15**

**This endorsement, effective 12:01 am, December 31, 2013**

**Forms part of policy number:  CH13DOL610110IV**

**Issued to:  Vizio Inc**

**By:  Navigators Insurance Company**

### CRISIS COMMUNICATION MANAGEMENT INSURANCE

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

In consideration of the premium charged, it is agreed that this Policy is amended to provide Crisis Management Coverage pursuant to the terms and conditions set forth below:

1)  DIRECTORS AND OFFICERS LIABILITY COVERAGE PART SECTION I., INSURING AGREEMENTS, is amended to add the following new insuring agreement:

    (E)  CRISIS MANAGEMENT COVERAGE

        This Policy shall pay the **Crisis Management Loss** of the **Company** arising from a **Crisis Management Event** first commencing during the **Policy Period**, up to the amount of the **Crisis Management Fund**.

2)  DIRECTORS AND OFFICERS LIABILITY COVERAGE PART SECTION III., EXCLUSIONS, shall not be applicable to **Crisis Management Loss**.

3)  GENERAL TERMS AND CONDITIONS SECTION IV., LIMIT OF LIABILITY, is amended to add the following:

    (D)  The limit of the Insurer's liability for **Crisis Management Loss** arising from all **Crisis Management Events** occurring during the **Policy Period**, in the aggregate, shall be the amount set forth as the **Crisis Management Fund**. This limit shall be the maximum limit of the Insurer under this Policy regardless of the number of **Crisis Management Events** occurring during the **Policy Period**, provided, however that this single **Crisis Management Event(s)** limit shall be part of and not in addition to the Limit of Liability set forth in Item 5. LIMIT OF LIABILITY (inclusive of **Costs of Defense)**", of the Declarations, which shall in all events be the maximum liability of the Insurer for all **Loss** under this Policy.

        There shall be no Retention amount applicable to **Crisis Management Loss**, and the Insurer shall pay such **Crisis Management Loss** from first dollar subject to the other terms and conditions of this endorsement.

    An actual or anticipated **Crisis Management Event** shall be reported to the Insurer as soon as practicable but in no event later than thirty (30) days after the **Company** first incurs **Crisis Management Loss** for which coverage will be requested under this endorsement.

**ENDORSEMENT NO.:  15**

4)      GENERAL TERMS AND CONDITIONS SECTION VI., ALLOCATION, COSTS OF
        DEFENSE AND SETTLEMENTS, shall have no applicability to **Crisis Management Events**.
        There shall be no requirement for the **Company** to obtain prior written approval of the Insurer
        before incurring any **Crisis Management Loss**, provided that the **Crisis Management Firm**
        selected by the **Company** to perform the **Crisis Management Services** has been approved by the
        Insurer.

**For the purposes of this endorsement, the following definitions shall apply:**

A)      "**Material Effect on the Company's Common Stock Price**" shall mean, within a period of 24
        hours, that the price per share of the **Company's** common stock shall decrease by the greater of
        $n/a per share or n/a% net of the change in the Standard & Poor's Composite Index

B)      "**Crisis Management Event**" shall mean:

        I.      One of the following events which, in the good faith opinion of the Chief Financial Officer
                of the **Company** did cause, or is reasonably likely to cause **a Material Effect on the
                Company's Common Stock Price**:

                (1)   **Negative earnings or sales announcement**

                      The public announcement of the **Company's** past or future earnings or sales, which is
                      substantially less favorable than any of the following: (i) the **Company's** prior year's
                      earnings or sales for the same period; (ii) the **Company's** prior public statements or
                      projections regarding earnings or sales for such period; or (iii) an outside securities
                      analyst's published estimate of the **Company's** earnings or sales.

                (2)   **Loss of a patent, trademark or copyright or major customer or contract**

                      The public announcement of an unforeseen loss of: (i) the **Company's** intellectual
                      property rights for a patent, trademark or copyright, other than by expiration; (ii) a
                      major customer or client of the **Company**; or (iii) a major contract with the **Company**.

                (3)   **Product recall or delay**

                      The public announcement of the recall of a major product of the **Company** or the
                      unforeseen delay in the production of a major product of the **Company**.

                (4)   **Mass tort**

                      The public announcement or accusation that the **Company** has caused the bodily
                      injury, sickness, disease, death or emotional distress of a group of persons, or damage
                      to or destruction of any tangible group of properties, including the loss of the use
                      thereof.

**ENDORSEMENT NO.:  15**

(5) **Employee layoffs or loss of key executive officer(s)**

The public announcement of employee layoffs, or the death or resignation of one or more key executive officer(s) of the **Company**.

(6) **Restatement of financial statement**

The public announcement of a restatement of the **Company's** previously filed financial statements.

(7) **Elimination or suspension of dividend**

The public announcement of the elimination or suspension of a regularly scheduled dividend previously being paid by the **Company**.

(8) **Write-off of assets**

The public announcement that the **Company** intends to write-off a material amount of its assets.

(9) **Debt restructuring or default**

The public announcement that the **Company** has defaulted or intends to default on its debt or intends to engage in a debt restructuring.

(10) **Bankruptcy**

The public announcement that the **Company** intends to file for bankruptcy protection, or a third party is seeking to file for involuntary bankruptcy on behalf of the **Company**, or the imminence of bankruptcy proceedings, whether voluntary or involuntary.

(11) **Governmental or regulatory litigation**

The public announcement of the commencement or threat of commencement of litigation or governmental or regulatory proceedings against the **Company**.

(12) **Other**

Any other event previously consented to by the Insurer which, in the good faith opinion of the Chief Financial Officer of the **Company**, did cause or is reasonably likely to cause, a **Material Effect on the Company's Common Stock Price**, but only if such event is specifically scheduled by written endorsement to the Policy.

ENDORSEMENT NO.: 15

II.     **Unsolicited takeover bid**

An unsolicited written offer or bid by any person or entity other than an **Insured** or any affiliate of any **Insured**, whether publicly announced or privately made to a director or executive officer of the **Company**, to effect (a) a consolidation with or merger into, or sale of all or substantially all of the **Company's** assets to any other person or entity or group of persons and/or entities acting in concert; or (b) the acquisition by any person or entity or group of persons and/or entities acting in concert of an amount of the outstanding ownership interests of the **Company** representing more than 50% of the voting or designation power for the election of **Directors** or **Officers** of the **Company**, or the acquisition by such persons and/or entities of the voting or designation rights of such an amount of such ownership interests.

Provided, however, that the term **Crisis Management Event** shall not include any event relating to:

(1)   any **Claim(s)** or **Wrongful Act(s)** which have been reported, or any circumstances of which notice has been given, under any policy the term of which incepted prior to the Inception Date of this Policy;

(2)   any demand, suit, or other proceeding pending on or existing prior to the applicable Prior Litigation Date set forth in Item 7. of the Declarations, or the same or substantially the same facts, circumstances or allegations which are the subject of or the basis for such demand, suit, or other proceeding;

(3)   the actual, alleged or threatened discharge, dispersal, release or escape of pollutants; or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants; provided, however, the foregoing shall not apply if the Policy contains any endorsement modifying or deleting, in part or in whole, Section III. A.9 in the Directors and Officers Liability Coverage Part, Section III. A.11 in the Employment Practices Liability Coverage Part, or Section III. A.3 in the Fiduciary Liability Coverage Part of the Policy; or

(4)   the hazardous properties of nuclear materials; provided, however, the foregoing shall not apply to any **Crisis Management Event(s)** arising from the ownership of, operation of, construction of, management of, planning of, maintenance of or investment in any nuclear facility.

The descriptions in the headings of the **Crisis Management Events** are solely for convenience and form no part of the terms and conditions of coverage.

For purposes of this endorsement, a **Crisis Management Event** shall first commence when the **Company** or any of its **Directors** or **Executive Officers** shall first become aware of the event and shall conclude at the earliest of the time when the **Crisis Management Firm** advises the **Company** that the crisis no longer exists or when the **Crisis Management Fund** has been exhausted.

ENDORSEMENT NO.:  15

C) "**Crisis Management Firm**" shall mean any public relations firm, crisis management firm or law firm hired by the **Company** or its **Directors**, **Officers** or employees to perform **Crisis Management Services** in connection with the **Crisis Management Event** which has been consented to by the Insurer, the consent for which shall not be unreasonably withheld.

D) "**Crisis Management Fund**" shall mean $10,000

E) "**Crisis Management Loss**" shall mean the following amounts incurred during the pendency of or within 90 days prior to and in anticipation of, the **Crisis Management Event**, regardless of whether a **Claim** is ever made against an **Insured** arising from the **Crisis Management Event** and, in the case where a **Claim** is made, regardless of whether the amount is incurred prior to or subsequent to the making of the **Claim**:

    (1) Amounts for which the **Company** is legally liable for the reasonable and necessary fees and expenses incurred by a **Crisis Management Firm** in the performance of **Crisis Management Services** for the **Company** arising from a **Crisis Management Event(s)**; and

    (2) Amounts for which the **Company** is legally liable for the reasonable and necessary printing, advertising, mailing of materials, or travel by **Directors**, **Officers**, employees or agents of the **Company** or the **Crisis Management Firm**, in connection with the **Crisis Management Event(s)**.

F) "**Crisis Management Services**" means those services performed by a **Crisis Management Firm** in advising the **Company** or any of its **Directors** and **Officers** or employees on minimizing potential harm to the **Company** arising from the **Crisis Management Event**, including but not limited to maintaining and restoring investor confidence in the **Company**.

Nothing in this endorsement shall be construed to increase the **Crisis Management Fund** described in this endorsement which shall remain the maximum liability of the Insurer for all **Crisis Management Loss** under this endorsement.

All other terms and conditions of this Policy remain unchanged.

ENDORSEMENT NO.:  16


**This endorsement, effective 12:01 am, December 31, 2013**

**Forms part of policy number:  CH13DOL610110IV**

**Issued to:  Vizio Inc**

**By:  Navigators Insurance Company**


### ADVANCEMENT OF DEFENSE COSTS (90 DAYS)

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.


It is agreed that **General Terms and Conditions, Section 1. Defense Obligations, B.,** is deleted in its entirety and replaced with the following:

**B.** if ITEM 3 of the Declarations states that the "No Duty to Defend" option has been elected, the Insurer will have no duty to defend any **Claim** against any **Insured**, and it will be the duty of the **Insureds**, and not of the Insurer, to defend any **Claim**. The Insurer will have the right, but not the duty, to associate with the **Insureds** in the investigation, defense or settlement of any **Claim** to which coverage under this Policy may apply. The Insurer will advance **Costs of Defense** no later than ninety (90) days after the receipt by the Insurer of such defense bills, on the condition that:

1. Any applicable retention shall have been satisfied;

2. Any amounts advanced by the Insurer will reduce the Insurer's applicable Limit of Liability under any applicable Coverage Part and under this Policy to the extent such amounts are not in fact repaid; and

3. In the event it is finally established that the Insurer has no liability under the Policy for **Loss** in connection with such **Claim** , the **Insureds** will repay the Insurer upon demand all **Costs of Defense** advanced to them or on their behalf.


All other terms and conditions of this Policy remain unchanged.

ENDORSEMENT NO.:  17


**This endorsement, effective 12:01 am, June 19, 2015**

**Forms part of policy number:  CH13DOL610110IV**

**Issued to:  Vizio Inc**

**By:  Navigators Insurance Company**


### AMEND DECLARATIONS PAGE

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.


In consideration of the Additional Premium of $15,918 it is hereby understood and agreed that Item
2. of the Declarations,  **Policy Period**  is amended to read as follows:

**ITEM 2. Policy Period**:

a) Inception Date: December 31, 2013
b) Expiration Date: December 1, 2015

At 12:01 a.m. both dates at the Principal Address in ITEM 1.

This endorsement shall not in any way increase the Limit of Liability, Item 5., set forth on the
Declarations Page.




All other terms and conditions of this Policy remain unchanged.

# POLICYHOLDER DISCLOSURE
# NOTICE OF TERRORISM
# INSURANCE COVERAGE

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, that you now have a right to purchase insurance coverage for losses arising out of acts of terrorism, *as defined in Section 102 (1) of the Act*: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States --to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property; or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT COVERAGE PROVIDED BY THIS POLICY FOR LOSSES CAUSED BY CERTIFIED ACTS OF TERRORISM IS PARTIALLY REIMBURSED BY THE UNITED STATES UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. UNDER THIS FORMULA, THE UNITED STATES GENERALLY PAYS 85% OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PORTION OF YOUR POLICY'S PREMIUM CHARGED FOR THIS COVERAGE IS: $0   WHICH DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION.  IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

If you have any questions about this notice, please contact your agent or Broker

NAV-DO-TERRA (12/07)